UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED PET SUPPLY, INC.    )
             )
    Plaintiff,     )
             )  1:11-CV-157; 1:11-CV-193
v.             )
             )  Collier/Lee
CITY OF CHATTANOOGA, *et al.*,  )
             )
    Defendants.   )

## MEMORANDUM

Before the Court is Defendants Animal Care Trust's, Karen Walsh's, Marvin Nicholson, Jr.'s, and Paula Hurn's ("Defendants") motion for judgment on the pleadings (Court File No. 37).[1] Plaintiff United Pet Supply, Inc. ("Plaintiff") responded to the motion (Court Files No. 40), and Defendants replied (Court Files No. 46). For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for judgment on the pleadings (Court File No. 37). Specifically, the Court denies Defendants' motion with respect Fourth Amendment and abuse of process claims. The Court grants in part and denies in part Defendant's motion as to Plaintiff's procedural due process claim. The Court grants in part and denies in part Defendants' motion with respect to Plaintiff's conversion claim. The Court also grants Defendants' motion with respect to Plaintiff's claims under the Tennessee Constitution, tortious interference with a business relationship claim, and tortious interference with a contract claim. Those claims on which the Court has granted Defendant's motion are **DISMISSED WITH PREJUDICE**.

_____

[1] Defendant City of Chattanooga did not take part in the motion for judgment on the pleadings. All court file numbers listed refer to the court files of Case 1:11-CV-157.

## I.     FACTS

The following facts are alleged in the complaint, which the Court accepts as true for the purposes of a motion for judgment on the pleadings. *Thurman v. Pfizer , Inc*., 484 F.3d 855, 859 (6th Cir. 2007).  Plaintiff operated a pet store in Hamilton Place Mall in Chattanooga, Tennessee (Court File No. 1, ¶ 7).  Plaintiff was licensed to operate a pet store by the state.  Defendant Animal Care Trust, also called McKamey Animal Care and Adoption Center ("McKamey"), is a Tennessee corporation with which the City of Chattanooga ("City") contracts for animal control services.  As a result of changes to the Chattanooga City Code ("City Code") in 2010, the City delegated enforcement of provisions of the City Code pertaining to animals to McKamey, including the issuance of permits for businesses engaged in dealing in the sale of pets or animals.  Defendants Walsh, Hurn, and Nicholson are all employees of McKamey, serving as Executive Director, Director of Operations, and Animal Service Officer, respectively.

In March and April 2010, pursuant to McKamey's authority under the City Code, Defendants Walsh and Nicholson began appearing at the pet store operated by Plaintiff.  Over a two month period, Defendants arrived during business hours seven times.  On four of the seven site visits, Defendants spoke to Plaintiff's landlord to discuss issues with Plaintiff's business.  On May 11, McKamey issued a permit to Plaintiff, signed by Defendant Walsh, stating Plaintiff was approved as a pet dealer in Chattanooga.  However, on June 15, 2010, Defendants Walsh, Nicholson, State Inspector Joe Carroll Burns, and several members of the Chattanooga Police Department arrived at Plaintiff's pet shop around 8:10 a.m., before business hours, and confiscated animals, business records, certain other property, and Plaintiff's city permit.  Defendant Hurn would arrive around 10:00 a.m..  This event was apparently precipitated by statements made to Defendant Walsh by a

2

former employee of the pet shop one week earlier.

When Defendants and others arrived on June 15, they gained access by "asserting their official authority to 'inspect' the Pet Shop's premises" (Court File No. 1, ¶ 44). When they arrived they saw soiled kennels, unreplenished water receptacles, and other signs of neglect. However, every morning Plaintiff's employees undertook a three-hour cleaning procedure, which normally began at 7:00 a.m. and ended at 10:00 a.m.. Due to the hour Defendants arrived at the pet shop, much of the cleaning had not yet occurred. Defendants instructed Plaintiff's employees not to interfere with their investigation, and after Defendant Hurn arrived she began videotaping the conditions of the premises. State Inspector Burns issued a written warning to Plaintiffs to repair one of the compressors in its air conditioning system. Around 11:00 a.m., Defendants confiscated Plaintiff's animals, including thirty-two puppies, six rabbits, one ferret, one guinea pig, and forty-two hamsters or mice. Defendants then confiscated business records and Plaintiff's physical copy of its city permit. Defendant Walsh informed Plaintiffs they could not sell pets until their hearing on June 24, 2010. While this process was ongoing, Plaintiff sought temporary injunctive relief in Hamilton County Circuit Court (Court File No. 37-1). Plaintiff's motion was apparently denied by the Circuit Court, but the grounds on which it was denied are unknown to the Court. Moreover, while the complaint states the property confiscation began at 11:00 a.m., the petition for injunction was filed at 1:20 p.m.

McKamey issued forty-three citations alleging ninety violations of the City Code. The facts supporting the violations were alleged as follows.

1. Air conditioning not working 3 weeks or more
2. No report to operations manager of mall
3. Isolation room at 85+ at 7 AM east
4. Hamsters and gerbils given dirty water in open bowls capable of drowning them

> 5. Cages cleaned with "Fabuloso", Mr. Clean or Lysol
> 6. Water bottles leaking until empty
> 7. Empty water bottles in isolation
> 8. Hamster was attacked "several days ago" no vet treatment provided
> 9. No water in any hamster cages in ISO ["isolation room"]
> 10. Cages broken undisinfectable
> 11. Cage bottoms/grates broken can trap feet
> 12. Dog died 4 days after health check, no record as to vet check.
> 13. Food for human consumption stored with vax
> 14. Cleaning containers not labeled
> 15. Training manager no knowledge of procedures.

(Court File No. 1, ¶ 65). The day following the raid, McKamey's website linked to an online petition to close the pet shop in Chattanooga. The petition called for a boycott of the Hamilton Place Mall until Plaintiff's pet shop was closed.

When McKamey took possession of the pet shop's puppies, they were all considered "bright, alert, and responsive" by McKamey, except for one German Shepherd puppy that was being treated by the pet shop's veterinarian. McKamey did not seek immediate care for the German Shepherd puppy. McKamey began seeking homes for the puppies. In September, the German Shepherd puppy died.

On June 24, 2010, nine days after Plaintiff's property was confiscated, the Chattanooga City Court held a hearing regarding the charges against Plaintiff. McKamey sought permanent custody of the animals confiscated during the raid. On June 30, the City Court ruled some of the conditions listed by Defendant Walsh could be remedied, McKamey would inspect the pet shop before allowing Plaintiffs to return the animals to the premises, and Plaintiffs were to receive all animals not diagnosed with disease or illness. McKamey, however, refused to return the animals. The Mayor of Chattanooga also sent a letter to the City Court, explaining he did not want McKamey to go uncompensated for its expenses, McKamey should be able to maintain custody of the animals until

4

they are repaid, and he did not trust Plaintiff. McKamey then inspected the store again and failed it for new violations of the City Code.

After a brief continuance, the City Court heard further evidence regarding the inspection of the pet shop. The City Court then declined to withdraw Plaintiff's permit, and deferred to the state with respect to its state license. Plaintiff's state license was subsequently renewed. The City sought repayment from Plaintiffs for some of its expenses incurred while caring for Plaintiff's confiscated animals. The City Court maintained McKamey must return the permit without a reapplication process, because McKamey did not have the authority to revoke the permit without a hearing, and that it would issue a ruling on the City's expenses. The Mayor later disseminated an open letter to the City Court critical of its ruling. The City Court then declared a mistrial due to the Mayor's actions.

After a different judge was assigned to the case in City Court, briefing was sought on the issue of whether the revocation of Plaintiff's permit was unlawful. The City Court later dismissed the case on double jeopardy grounds and stated the City Court was without authority to make an order regarding Plaintiff's permit. After multiple demands for its license and animals, the City returned the permit to Plaintiff and Plaintiff reopened its shop. Subsequently, McKamey returned Plaintiff's animals, apparently in compliance with a court order. Plaintiff's dogs were no longer puppies and were adopted to families without charge.

Plaintiff sought redress in this court and in Hamilton County Circuit Court. Once the latter case was removed, the cases were consolidated. After the instant motion was filed, the City amended the relevant portion of the City Code, essentially removing the permit provisions delegating the task to McKamey altogether and establishing an "Animal Control Board" to

5

determine whether the City should require permits and, if so, what type of permits to require. Chattanooga City Ordinance 12653 (Oct. 2, 2012). References to the City Code refer to the Code as it existed when the alleged violations occurred.

## II.     STANDARD OF REVIEW

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is considered using the same standard of review as a Rule 12(b)(6) motion. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). A Rule 12(b)(6) motion should be granted when it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 405 (6th Cir. 1998). For purposes of this determination, the Court construes the complaint in the light most favorable to the Plaintiff and assumes the veracity of all well-pleaded factual allegations in the complaint. *Thurman*, 484 F.3d at 859. The same deference does not extend to bare assertions of legal conclusions, however, and the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). The Court next considers whether the factual allegations, if true, would support a claim entitling the Plaintiff to relief. *Thurman*, 484 F.3d at 859. Although a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief," *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting Fed. R. Civ. P. 8(a)(2)), this statement must nevertheless contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, "[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

When considering a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." Id. (citing *JP Morgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007)). The Court, however, "need not accept as true legal conclusions or unwarranted factual inferences." *JP Morgan Chase Bank*, 510 F.3d at 581-82. "Pleadings" include, *inter alia*, the complaint and answer. Fed. R. Civ. P. 7(a)(1)-(2). "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Because "documents attached to the pleadings become part of the pleadings[, they] may be considered on a motion to dismiss . . . without converting a motion to dismiss into one for summary judgment." *Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007). However, a district court must not consider other evidence submitted outside of the pleadings or the court's decision will effectively convert the motion for judgment on the pleadings to a motion for summary judgment. *Max Arnold & Sons, LLC v. W.L. Hailey & Co., Inc.*, 452 F.3d 494 (6th Cir. 2006). Beyond not considering the offered evidence, a district court must exclude submitted evidence offered by the parties extraneous to the pleadings. *Id.* at 503.

The Court can, however, take judicial notice of matters within the public record and not convert a Rule 12(c) motion into a motion for summary judgment. *Commercial Money Center, Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007). Accordingly, the Court will take judicial notice of the certified copies of court records and filings that have been provided to the Court (Court File Nos. 37-1, 37-2, 37-3). *See Lynch v. Leis*, 382 F.3d 642, 647 n.5 (6th Cir. 2004). The Court notes it will only take notice of the *existence* of these filings and their contents. *See In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 875 (E.D. Tenn. 2005). Not only would

7

considering their contents to resolve factual disputes be improper, *id.*, but on a Rule 12(c) motion the Court must regard the factual allegations in the complaint as true. The Court also may consider the City Code. Although the Sixth Circuit has "refined" the meaning of the term "judicial notice" to exclude local law, because courts "find" or "determine" law rather than take notice of it, *United States v. Alexander*, 467 F. App'x 355, 360-61 (6th Cir. 2012) (citing *United States v. Dedman*, 527 F.3d 577 (6th Cir 2008)), the effect of the Sixth Circuit's distinction is largely semantic, *Dedman*, 527 F.3d at 587, and the Court may consider the City Code.

The Court will not, however, consider the American Society for the Prevention of Cruelty to Animals ("ASPCA") grant application offered by Plaintiff, because it does not appear to be a public document (Court File No. 40-1). Moreover, the Court will not take judicial notice of the transcript of Chattanooga City Council committee meetings because, although such meetings may be public record, the copies provided the Court are uncertified and the Court is disinclined to take notice of uncertified documents (Court File Nos. 40-2, 40-3). Similarly, the police report offered by Plaintiffs is uncertified and likely refers to matters in dispute and would therefore be inappropriate for judicial notice (Court File No. 40-4). Fed. R. Evid. 201(b); *see also United States v. Bonds*, 12 F.3d 540, 553 (6th Cir. 1993). The Court excludes those exhibits of which it will not take judicial notice, will not consider them in rendering its decision, and will properly consider Defendants' motion only on the pleadings and those documents it found appropriate for judicial notice.

## III.    ANALYSIS

### A.    Section 1983

To state a viable claim under 42 U.S.C. § 1983, a plaintiff must allege he was deprived of a right, privilege, or immunity secured by the Constitution or laws of the United States by a person

acting under color of law, without due process of law. *Flagg Brothers Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Chatman v. Slagle*, 107 F.3d 380, 384 (6th Cir. 1997); *Brock v. McWherter*, 94 F.3d 242, 244 (6th Cir. 1996); *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir. 1994); *Rhodes v. McDannel*, 945 F.2d 117, 119 (6th Cir. 1991), *cert. denied*, 502 U.S. 1032 (1992). Although the Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts underlying the claim, the plaintiff must provide sufficient allegations to give defendants fair notice of the claims against them. *Leatherman v. Tarrant County Narcotic Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993). To state a § 1983 claim, Plaintiff must allege sufficient facts that, if true, would establish the defendants deprived him of a right secured by the Constitution of the United States while acting under color of law. *See Brock*, 94 F.3d at 244. Defendants do not dispute they were acting under color of state law. The Court will therefore turn to the question whether Plaintiff has properly pleaded violations of its constitutional rights.

### 1. Procedural Due Process

Plaintiff's first two counts argue Defendants violated its right to procedural due process when they took Plaintiff's permit, animals, and business records without a pre-deprivation hearing. Plaintiff argues it had a property interest in the permit, animals, and business records and that a pre-deprivation hearing was possible, practicable, and necessary.

Procedural due process claims require a two-part analysis. "First, the Court must determine whether the interest at stake is a protected liberty or property interest under the Fourteenth Amendment." *Wojcik v. City of Romulus*, 257 F.3d 600, 609 (6th Cir. 2001) (citing *Mathews v. Eldridge*, 424 U.S. 319, 322 (1976)). The Court will only determine if the deprivation of the interest fell short of due process requirements if the underlying interest is protected. *Id.* Property interests are not created by the Constitution, but "are created and their dimensions are defined by existing

9

rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* (quoting *Parratt v. Taylor*, 451 U.S. 527 (1981)). Such a "legitimate claim of entitlement" or "justifiable expectation" exists where the approval of the permit is mandatory once an applicant meets certain minimal requirements. *Silver v. Franklin Tp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1035 (6th Cir. 1992).

If the Court determines Plaintiff has established a protected property interest, it then determines whether the deprivation of that interest violated due process. "Generally, the process that is due before a property deprivation includes prior notice and an opportunity for a predeprivation hearing." *Warren v. City of Athens, Ohio*, 411 F.3d 697, 709 (6th Cir. 2005). A plaintiff pursuing a claim under § 1983 must demonstrate either "(1) an established state procedure that itself violates due process rights, or (2) a 'random and unauthorized act' causing a loss for which available state remedies would not adequately compensate the plaintiff." *Id.* "Unauthorized" in this context means the official who performed the deprivation did not have the power or authority to do so. *Id.* The established state procedure prong applies to municipal procedures. *See Warren*, 411 F.3d at 710 (concluding, in the alternative, that a city's action violated the plaintiff's rights under the established state procedure prong); *Burtnieks v. City of New York*, 716 F.2d 982, 988 (2d Cir. 1983) ("[D]ecisions made by officials with final authority over significant matters, which contravene the requirements of a written municipal code, can constitute established state procedure.").

When a plaintiff proceeds under the "established state procedure" prong, the plaintiff need not plead nor prove the inadequacy of the state remedies it was afforded. *Warren*, 411 F.3d at 709. Rather, the Court must "evaluate the challenged procedures directly to ensure that they comport with due process." *Moore v. Bd. Ed. Johnson City Schools*, 134 F.3d 781 (6th Cir. 1998) (quoting

*Macene v. MJW, Inc.*, 951 F.2d 700 (6th Cir.1991)). This determination is made according to three

factors outlined by the Supreme Court in *Mathews*.

> First, the private interest that will be affected by the official action; second, the risk
> of an erroneous deprivation of such interest through the procedures used, and the
> probable value, if any, of additional or substitute procedural safeguards; and finally,
> the Government's interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural requirement would
> entail.

424 U.S. at 335.

### a. Property Interest

Although Defendants do not dispute Plaintiff had a property interest in its animals and

business records, Defendants argue Plaintiff fails to establish a property interest in its permit

sufficient to incur the protection of procedural due process. Defendants cite *Littlefield v. City of

Afton*, 785 F.2d 596 (8th Cir. 1992) and *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence*, 927

F.2d 1111 (10th Cir. 1997) in support of their argument Plaintiff's claim did not allege facts

sufficient to establish a property interest. In *Littlefield*, the Eighth Circuit reversed a district court's

decision that plaintiffs did not have a protected property interest in a building permit. The court

determined the plaintiffs had a property interest in the building permit because Minnesota state law

required the city to issue a permit when an applicant complied with the ordinance. Conversely, in

*Jacobs*, the Tenth Circuit concluded plaintiffs did not have a protected property interest in a

rezoning application because, although Kansas required cities to make "reasonable" decisions with

respect to zoning ordinances and Kansas courts had listed six factors a zoning body should consider

when hearing requests for a change, the scant limitations on the zoning board's discretion were

insufficient to establish a legitimate claim of entitlement. *Jacobs*, 927 F.2d at 1117.

The Court concludes Plaintiff has pleaded sufficient facts to show a legitimate claim of

entitlement to the pet dealer permit. Unlike the plaintiffs in either of the cases relied upon by

Defendants, Plaintiff already held the permit issued by McKamey.  Whether McKamey was sufficiently constrained by the City Code in its *initial* determination is not at issue, because here Plaintiffs already received the permit.  Rather this case deals with the *revocation* of a permit, in which the Court finds Plaintiff had a "legitimate claim of entitlement."  Under Tennessee law, a professional license that is only revocable upon a showing of cause "is a constitutionally protectable property interest because the holder of the license has a clear expectation that he or she will be able to continue to hold the license absent proof of culpable conduct." *Martin v. Sizemore*, 78 S.W.3d 249, 263-64 (Tenn. Ct. App. 2001). For example, once a bail bondsman is granted the right to engage in the bail bonds business, it becomes a right protected by due process. *State v. AAA Aaron's Action Agency Bail Bonds, Inc.*, 993 S.W.2d 81, 85 (Tenn. Crim. App. 1998).  Recognizing a license or permit as protectable after it has been granted is consistent with the broader procedural due process case law.  *See, e.g.*, *Wojcik*, 257 F.3d at 609-10 ("Michigan courts have held that the *holder* of a liquor license has a constitutionally protected interest and is therefore entitled to proper proceedings prior to making decisions regarding renewal or revocation.") (emphasis in original); *Chandler v. Village of Chagrin Falls*, 296 F. App'x 463, 469 (6th Cir. 2008) ("This Court has held that the holder of a building or zoning permit has a constitutionally protected interest and is therefore entitled to proper proceedings prior to a final determination regarding revocation."); *Watts v. Burkhart*, 854 F.2d 839, 842 (6th Cir. 1988) ("[S]tate regulation of occupations through a licensing process gives rise to protected property interests."); *but see Silver*, 966 F.2d at 1036 (holding a plaintiff did not have a protectable interest in a conditional zoning certificate).

Further, unlike an initial issuance, the revocation of a permit by McKamey is subject to some limitation.  Section 7-34(e) of the City Code provides,

> [Pet dealer] permits may be revoked if negligence in care or misconduct occurs that is detrimental to animal welfare or to the public.  Revocation of such permit may

only be reinstated after successfully passing an inspection of such facilities and paying the cost of such permit and any applicable fines and fees.

Although McKamey makes the determination whether negligence in care or misconduct detrimental to animal welfare or to the public has occurred, it is only entitled to revoke a permit if that standard is met. The City Code is silent as to the proper procedure for the revocation, but McKamey's discretion to do so is limited by the standard in § 7-34(e). The Court finds Plaintiff has pleaded sufficient facts to show a "legitimate claim of entitlement" or "justified expectation" to the permit because its permit had already been issued, and McKamey's discretion to revoke the permit was limited.

### b. Deprivation procedures

Because the Court has determined Plaintiff pleaded sufficient facts to support a legitimate claim of entitlement to its pet dealer permit, and because Defendants do not dispute Plaintiff had a protectable property interest in its animals and business records, the Court must consider whether Plaintiff pleaded sufficient facts to show the inadequacy of the deprivation procedures it was afforded in the confiscation of those items.

### i. Permit

Defendants and Plaintiff dispute the adequacy of the post-deprivation hearing provided in the City Court as well as a hearing on Plaintiff's pre-deprivation petition for a temporary restraining order. Defendants argue these procedures were adequate under the rule announced in *Parratt v. Taylor*, 451 U.S. 527 (1981). In *Parratt*, the Supreme Court held, where a deprivation of property is "random and unauthorized," a pre-deprivation proceeding would be impossible to provide. Therefore, an adequate post-deprivation tort remedy would be sufficient to satisfy due process requirements because "[it] is the only remed[y] the State could be expected to provide." *Zinermon*

13

*v. Burch*, 494 U.S. 113, 128-29 (1990). In such a case, the plaintiff must prove "that the post-deprivation process afforded by the state is somehow inadequate to right the wrong at issue." *Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir. 1991). That is, the *Parratt* rule precludes a plaintiff from showing he was due a *pre*-deprivation hearing; he must instead show whatever post-deprivation remedies he was afforded were still constitutionally insufficient.

The *Parratt* rule, however, is inapplicable here. First, the Court notes Plaintiff's claim is not comfortably in the category of a challenge to established state procedures. With respect to the permit revocation, the Court notes § 7-34(e), is not explicit as to the procedure to be used for revoking permits. However, it accords McKamey authority to determine when grounds for revocation occur. Moreover, Defendants admit in their answer to Plaintiff's complaint their policy, adopted pursuant to McKamey's authority under the City Code, is to revoke permits without a pre-deprivation hearing.

> The Answering Defendants aver that the Chattanooga City Code, considered and applied as a whole, provides for an officer, or special officer, of the City of Chattanooga to investigate complaints of negligence in care or misconduct that is detrimental to animal welfare or to the public made against pet dealers and provides the authority for the officers or special officers to revoke a pet dealer's license when it is found to be operating in violation of the City Code. A special officer or officer of the City of Chattanooga is authorized to issue citations for the violation of City Code to a pet dealer and a hearing is provided pursuant to the City Code in the Chattanooga City Court within a reasonable period of time. If the Chattanooga City Court determines there was no violation of the City Code, the pet dealer's license is reinstated. If a violation of the City Code is determined to have occurred, the pet dealer's license is not reinstated until the pet dealer's facility successfully passes an inspection.
> . . . .
> The Answering Defendants aver that ACT's position with respect to a pet dealer's permit was, and is, that a pet dealer's permit can be revoked upon a finding of negligence in care, misconduct, abuse and/or cruelty by a duly appointed officer of the City of Chattanooga and upon issue of a citation to City Court for such conduct. The Answering Defendants aver that ACT's policy is to reinstate the license if an effective order from the Chattanooga City Court determines there is no violation of the Chattanooga City Code or upon a satisfactory inspection of the pet dealer's premises.

14

(Court File No. 20, ¶¶ 25, 89). Actions pursuant to agency policy that itself is in compliance with established procedure can be considered an attack on "established state procedure" for the purposes of procedural due process. *See Watts v. Burkhart*, 854 F.2d 839, 843-44 (6th Cir. 1988) ("The relevant state action in the instant case is the state agency's deliberate decision to obtain either the voluntary surrender of Watts' DEA authorization or the summary suspension of Watts' license, which was done under established state procedure; the focus is not on the possibly random actions taken in carrying out the state procedures."); *Spruytte v. Walters*, 753 F.2d 498, 509-10 (6th Cir.1985), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995) (holding the *Parratt* rule does not apply where actions were performed pursuant to a prison policy directive); *Burtnieks*, 716 F.2d at 988 ("[D]ecisions made by officials with final authority over significant matters, which contravene the requirements of a written municipal code, can constitute established state procedure.").

However, the Court cannot say Plaintiff's challenge is to the provisions of the City Code itself. The City Code does not require revocation without a pre-deprivation hearing. Indeed, in Plaintiff's complaint it repeatedly emphasizes Defendants acted without explicit authority to deprive it of its permit and property without a pre-deprivation hearing (*see* Court File No. 1, ¶¶ 25, 56) ("The revised City Code stated that the City Permit 'may be revoked if negligence in care or misconduct 'occurs' that is detrimental to animal welfare or to the public,' without specifying any procedures for revoking the permit or any provision for a hearing."); ("No provision of the revised City Code provides for the summary seizure of the Pet Shop's animals, and the state laws and regulations governing licensed commercial pet dealers prohibit such seizures."). Somewhat contradicting itself, the complaint then asserts the "City Code as written and as applied to [Plaintiff] conflicts with, infringes on, and disregards rights specifically granted by State law, and the accompanying

15

regulatory scheme, governing the licensing of commercial pet dealers in the State of Tennessee" (*id.* at ¶ 117). This provision of the complaint was likely included to suggest the City Code itself was somehow inconsistent with state law. Plaintiff's argument apparently stems from Tenn. Code. Ann. § 44-17-122, which provides "[w]hen implementing the provisions for issuance of [pet] dealer licenses, the commissioner [of agriculture] shall take into consideration other federal and/or local licensing regulations that may apply, it being the intent of the legislature not to impose duplicative licensing requirements and costs for dealers." Plaintiff argues the City Code thus conflicts with the state policy of avoiding duplicative licensing requirements. However, the Court reads § 44-17-122 to suggest the state anticipates local licensing will exist, and instructs the commissioner to avoid duplicating it at the state level, not the other way around.

The complaint also states the City Code "as written and as applied is arbitrary, capricious and without rational basis in that it, in effect, authorizes and permits defendant Walsh to effectively close a lawful business indefinitely, or even permanent, at whim, and without any mechanism for any hearing or review."[2] Plaintiff appears to contend the City Code is invalid because it provides Defendant Walsh the authority to revoke a permit without a pre-deprivation hearing, although it does not require it. The Code itself does not, however, contain procedures, as Plaintiff states many times

_____

[2] The Court notes Plaintiff has not challenged the Code as unconstitutionally vague or overbroad. *See City of Chicago v. Morales*, 527 U.S. 41 (1999) (concluding a vague no loitering statute is not unconstitutional on First Amendment grounds, but violates due process due to its vagueness and failure to limit discretion of enforcement officials). Indeed neither of those words appears in the complaint, nor in Plaintiff's many filings. Rather, Plaintiff lists this language as an allegation under the count alleging a violation of procedural due process. *See, e.g.*, *Simon v. Cook*, 261 F. App'x 873 (6th Cir. 2008) (treating void-for-vagueness, overbreadth, and procedural due process as separate claims). Given none of the parties addresses a vagueness challenge in its filings, the Court concludes Defendants were not on notice of a vagueness challenge contained in the ambiguous complaint, to the extent Plaintiff would have asserted one. *See Cummings v. City of Akron*, 418 F.3d 676, 681 (6th Cir. 2005) ("We apply a 'course of the proceedings' test to determine whether defendants in a § 1983 action have received notice of the plaintiff's claims where the complaint is ambiguous."). The Court will therefore take the complaint as written.

in its complaint. *See Zinermon v. Burch*, 494 U.S. 113 (1990) ("Burch's suit is neither an action challenging the facial adequacy of a State's statutory procedures, nor an action based only on state officials' random and unauthorized violation of state laws."). To the extent the complaint states the City Code on its face is an established state procedure that violates due process, the Court concludes the revocation provision of the City Code itself does not contain violative procedures.

Therefore, the challenge is not to the facial validity of the City Code, but to the manner by which Defendants exercised their authority pursuant to the City Code. Although cases such as this do not fit neatly within either the "established state procedure" category or the "random and unauthorized" act category, "it is not necessarily the case that a due process challenge to state action not involving an 'established state procedure' must automatically come within the *Parratt* and *Hudson* rule governing random and unauthorized acts." *Mertik v. Blalock*, 983 F.2d 1353, 1365-66 (6th Cir. 1993). Rather, the Supreme Court's ruling in *Zinermon v. Burch*, 494 U.S. 113 (1990), demonstrates cases such as the instant case, although not challenging an established state procedure, still fall outside the *Parratt* rule.

*Zinermon* involved a plaintiff who had been voluntarily admitted to a state mental health facility in Florida. The plaintiff was not discharged for five months, and he filed suit claiming his consent to be admitted to the facility was not given voluntarily due to his mental state at the time he was admitted. The Court considered Florida's statutes on point for admission to mental health facilities and concluded, as the plaintiff conceded, "if Florida's statutes were strictly complied with, no deprivation of liberty without due process would occur." *Zinermon*, 494 U.S. at 117-18 n.3. The Court concluded, however, that the *Parratt* rule was inapplicable to the case, contrary to what the hospital administrator had argued. Pertinent here, the Court stated

> It may be permissible constitutionally for a State to have a statutory scheme like
> Florida's, which gives state officials broad power and little guidance in admitting

mental patients. But when those officials fail to provide constitutionally required procedural safeguards to a person whom they deprive of liberty, the state officials cannot then escape liability by invoking *Parratt* and *Hudson*. It is immaterial whether the due process violation Burch alleges is best described as arising from petitioners' failure to comply with state procedures for admitting involuntary patients, or from the absence of a specific requirement that petitioners determine whether a patient is competent to consent to voluntary admission. Burch's suit is neither an action challenging the facial adequacy of a State's statutory procedures, nor an action based only on state officials' random and unauthorized violation of state laws. Burch is not simply attempting to blame the State for misconduct by its employees. He seeks to hold state officials accountable for their abuse of their broadly delegated, uncircumscribed power to effect the deprivation at issue.

494 U.S. at 135-36.

The Court then concluded the *Parratt* rule was inapplicable for three reasons. First, the deprivation was not unpredictable because "[a]ny erroneous deprivation will occur, if at all, at a specific, predictable point in the admissions process-when a patient is given admission forms to sign." *Id.* 136. Second, pre-deprivation procedures were not impossible because "Florida already has an established procedure for involuntary placement." *Id.* 136-37. Third, the conduct of the hospital was not "unauthorized" under the *Parratt* rule because the state delegated the "power and authority to effect the very deprivation complained of here . . . and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful confinement." *Id.* at 138.

Thus, as the Sixth Circuit has concluded, the Court must look "to the nature of the deprivation complained of and the circumstances under which the deprivation occurred to determine whether the rule of *Parratt* and *Hudson* applies to defeat a procedural due process claim." *Mertik*, 983 F.2d at 1366. This analysis is "particularly warranted" where "the plaintiff specifically alleges that the conduct at issue was not random and unauthorized (and thus outside the rule of *Parratt* and *Hudson*) but does not specifically challenge or identify an established state procedure that caused the liberty and property deprivations at issue." *Id.* at 1366-67. The Court concludes the factors

18

counsel against applying the *Parratt* rule here.

First, as in *Zinermon*, the deprivation here was predictable. Permits will only be revoked after negligence or mistreatment has been alleged and discovered. In the instant case, McKamey apparently became aware of the possible violations through a former employee. Officials arrived en masse, complete with local law enforcement and state officials. Such a procedure is predictable. There is also no need to surprise permit holders with revocation, because the City Code confers on McKamey the authority to inspect premises upon reasonable cause to believe there is a violation of the provisions of Chapter 7 of the City Code. Chattanooga City Code § 7-12. Any notice provided would presumably come after such an investigation occurred and evidence was acquired. Second, pre-deprivation procedures are clearly not impossible here. Tennessee, with respect to state pet dealer licensing procedures, provides ten days written notice and an opportunity for a hearing when the state license is to be revoked or suspended. Tenn. Code Ann. § 44-17-107. Finally, McKamey is authorized by the City Code to carry out the permit procedures on behalf of the City. Chattanooga City Code § 7-1. It is undisputed the McKamey officials were delegated the authority to determine when and how to revoke an issued permit.

Having concluded the *Parratt* rule is inapplicable, the Court must consider the proper procedures due under *Mathews*. As discussed above, the Court must consider the following factors to determine whether the procedures afforded Plaintiff were sufficient to satisfy due process.

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335. The Court is aware "that the fundamental requirement of the Due Process Clause 'is the opportunity to be heard and it is an opportunity which must be granted in a

meaningful time and in a meaningful manner.'" *Ramsey v. Board of Educ. of Whitley County, Ky.*, 844 F.2d 1268, 1272 (6th Cir. 1988) (quoting *Parratt*, 451 U.S at 540). "[I]n some cases due process is satisfied by the opportunity for hearing in state court after a deprivation of property has occurred." *Id.* (citing *Parratt*, 451 U.S. at 534-44; *Hudson v. Palmer*, 468 U.S. 517, 536-37 (1984)).

First, the private interest at issue here is an important one: "operating a business and, stated more broadly, pursuing a particular livelihood." *Tanasse v. City of St. George*, 172 F.3d 63 (10th Cir. 1999); *see also Spinelli v. City of New York*, 579 F.3d 160, 171 (2d Cir. 2009) (quoting *Tanasse*). "The Supreme Court has held repeatedly that the property interest in a person's means of livelihood is one of the most significant that an individual can possess." *Ramsey*, 844 F.2d at 1273. Accordingly, the private interest is a compelling factor in favor of robust procedural protection. Second, the Court finds a pre-deprivation hearing would lessen the risk of erroneous deprivation. Here, the City Court found Plaintiff's permit had been erroneously revoked and concluded it should be reinstated.[3] Clearly, had there been some means of pre-deprivation review, the erroneous deprivation would have been less likely to occur.

The third factor, the government's interest, also weighs in favor of pre-deprivation hearing and notice. Although McKamey will be required to establish violations of the City Code before revoking a permit, such a pre-deprivation showing requires nothing additional from McKamey. McKamey is still free to inspect and obtain evidence that can be used at the hearing. Moreover, the actual hearing itself need not change in character; the hearing need only occur at a different time. McKamey is empowered to impound and confiscate animals in exigent circumstances. Therefore, no danger need befall an animal or the public before a pre-deprivation hearing takes place on the

---

[3] More specifically stated, the City Court apparently concluded the permit was never effectively revoked.

revocation of a pet dealer's permit.

Because the Court concludes the *Mathews* factors weigh in favor of traditional pre-deprivation notice and hearing,[4] Plaintiff suffered a violation of its rights under the Due Process Clause.

### ii. Animals

With respect to the animals confiscated, the Court also concludes the *Parratt* rule is inapplicable. Indeed, the authority to impound animals is more explicitly provided in the City Code, including the procedure for *post*-deprivation notice. Section 7-19 provides

> (a) The McKamey Animal Center shall take up and impound any animal found running at large and/or in violation of this Chapter.
> . . .
> (c) Excluding owner-relinquished animals, if the McKamey Animal Center takes custody of a domestic animal pursuant to this chapter, the McKamey Animal Center shall give notice of such seizure by posting a copy of it at the property location at which the animal was seized or and at the property at which an [sic] McKamey Animal Center officer reasonably believes the animal may reside or by delivering it to a person residing on such properties within two (2) business days of the time the animal was seized.

Chattanooga City Code § 7-19. Sections 7-21 and 7-27 duplicate the notification procedure of § 7-19(c), for all animals and only domestic animals, respectively. Section 7-22 provides a means of claiming and redeeming the impounded animal upon payment of a fee. Then, with respect to the confiscated animals, Plaintiff challenges an established state procedure and is not subject to the *Parratt* rule.

---

[4] Defendants argue Plaintiff did receive such a hearing, because Plaintiff sought a temporary restraining order in circuit court while the confiscation was ongoing. The Court notes this was not a *pre*-deprivation hearing. Although Defendants claim the officers on site did not begin confiscating materials until after the circuit court denied Plaintiff's petition, the complaint states the confiscation started at 11:00 a.m., whereas the petition was not filed until after 1:00 pm. The Court must, in a Rule 12(c) motion, treat the allegations in the complaint as true. Moreover, because Plaintiff is not subject to the *Parratt* rule, it need not establish the inadequacy of its state tort remedy.

The Court concludes the *Mathews* factors again weigh in favor of requiring a pre-deprivation hearing with respect to a pet dealer's animals. The Court notes the above-discussed property interest is again implicated here: The animals confiscated by Defendants were the basis of Plaintiff's business and livelihood. Additionally, animal owners have a "substantial interest in maintaining [their] rights in a seized animal." *O'Neill v. Louisville/Jefferson County Metro Gov't*, 662 F3d 723, 733 (6th Cir. 2011) (quoting *Siebert v. Severino*, 256 F.3d 648, 660 (7th Cir. 2001)) (internal quotations omitted). Further, the risk of erroneous deprivation is also implicated as it was above. The Court concludes the government's interest is not significantly heightened here. There is no suggestion in the complaint the animals or public were in grave danger. Were exigent circumstances present, the analysis may be different, but no such circumstances are apparent from the complaint. *See Siebert*, 256 F.3d at 660 n.10 (holding seizure of animals without a pre-deprivation hearing may be appropriate where exigent circumstances exist). Moreover, a hearing body could issue an order of protection if there were legitimate concerns regarding the animals' safety.

Plaintiff has therefore successfully pleaded a procedural due process violation with regard to confiscation of its animals as well.

### iii. Business Records

Although less clear, the Court concludes the Plaintiff is not subject to the *Parratt* rule with respect to its confiscated business records. No provision of the City Code specifically discusses business records or documents, but McKamey is conferred broad authority under the City Code to inspect, regulate, and enforce laws regarding pet dealers within Chattanooga city limits. *See* City Code § 7-1 ("McKamey Animal Center shall provide animal services for the City of Chattanooga. . . . [including] . . . the enforcement of animal-related codes as stated in the Tennessee code and City Code."). Additionally, § 7-34(h) requires any person who sells a dog or cat to keep a written record,

which shall be provided to McKamey upon request. Then, much like the revocation of its permit, the City Code is silent as to the business records at issue, but the City Code's broad delegation to McKamey provided "the power and authority to effect the very deprivation complained of here . . . and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful confinement." *Zinermon*, 494 U.S. at 138. In addition, the deprivation certainly was not "unpredictable," for the same reasons the permit revocation was not unpredictable, and a pre-deprivation hearing was similarly not impossible. Accordingly, the *Parratt* rule is inapplicable to all of the property confiscated by McKamey without a pre-deprivation hearing.

The Court concludes, however, a post-deprivation hearing and notice is all that is required in confiscation of business records. The private interest at stake with respect to its business records is minimal. *See Germano*, 648 F. Supp. at 985. Moreover, Plaintiff has a remedy for unconstitutionally confiscated documents under state tort remedies. *See Int'l Metal Trading, Inc. v. City of Romulus, Mich.*, 438 F. App'x 460, 463 (6th Cir. 2011). The government, on the other hand, has a strong interest in obtaining evidence of violations of the City Code. Were Plaintiff entitled to a pre-deprivation hearing as to its business records, evidence could be lost. Balancing the *Mathews* factors, the Court concludes Plaintiff was not entitled to a pre-deprivation hearing with respect to its business records. Plaintiff therefore fails to state a claim in confiscation of its business records.

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion with respect to Plaintiff's procedural due process claim. The Court denies the motion on count one, which alleges a procedural due process violation in the revocation of its permit. The Court grants in part and denies in part Defendant's motion on count two, which claims a violation as to the confiscation of Plaintiff's animals and business records. Specifically, the Court

denies the motion in regard to the confiscation of Plaintiff's animals, but grants it in regard to the confiscation of Plaintiff's business records.

## 2. Fourth Amendment

Plaintiff claims Defendant violated its Fourth Amendment rights when it searched the pet shop and seized its animals and business records. Plaintiff also attacks the facial validity of the City Code.

The Fourth Amendment protects individuals from, *inter alia*, unreasonable searches and seizures. U.S. Const. amend. IV. In addition to private homes, the Fourth Amendment's protections are applicable to commercial premises. However, warrantless inspections of commercial premises may be reasonable under the pervasively regulated business doctrine, which applies if three factors are satisfied:

> (1) a "substantial" government interest exists "that informs the regulatory scheme pursuant to which the inspection is made"; (2) the inspection is "necessary to further the regulatory scheme"; and, (3) the statute's inspection program provides a "constitutionally adequate substitute for a warrant" in that it "advise[s] the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope" and it "limit[s] the discretion of the inspecting officers."

*United States v. Branson*, 21 F.3d 113, 116 (6th Cir. 1994) (quoting *New York v. Burger*, 482 U.S. 691, 702 (1987)). Plaintiff does not seriously contest the applicability of the first two considerations. Indeed, the Court finds animal control is a substantial government interest that informs the regulatory scheme and that inspections of pet dealer premises are necessary to further that regulatory scheme.

Rather, Plaintiff's focus is on the third factor: whether the City Code is a constitutionally adequate substitute for a warrant in that it advises the owner of a commercial premises that the search is being made pursuant to law, that the scope is properly defined, and that limits the

discretion of inspecting officers.  The Court finds that it does.  Plaintiff focuses on § 7-34(d) of the

City Code which notes permit applicants may be subject to inspection.   Section 7-34(d) states

"[f]acilities of any of the above permit applicants[5] and registered rescue organizations will be subject

to inspection by Animal Service Officers for compliance with this chapter's and the permit's

minimum standards." Plaintiff argues there is simply no limit in discretion or otherwise codified

standards in that section sufficient to satisfy the standard outlined in *Burger*.   The Court, however,

finds the authority to inspect is circumscribed by § 7-12 which provides the following.

> Whenever it is necessary to make an inspection to enforce any of the provisions of or perform any duty imposed by this Chapter or other applicable law, or whenever there is reasonable cause to believe that there exists in any building or upon any premises any violation of the provisions of this Chapter or other applicable law, an animal service officer or police officer is hereby empowered to enter such property at any reasonable time and to inspect the property and perform any duty imposed by this chapter or other applicable law, but only if the consent of the occupant or owner of the property is freely given or a search warrant is obtained, as follows:
> (a) If such property is occupied, the officer shall first present proper credentials to the occupant and request permission to enter, explaining his reasons therefore;
> (b) If such property is unoccupied, the officer shall first make a reasonable effort to locate the owner or other persons having charge or control of the property, present proper credentials and request permission to enter, explaining his reasons therefore; and
> (c) If such entry is refused or cannot be obtained because the owner or other person having charge or control of the property cannot be found after due diligence, the animal services officer shall seek to obtain a warrant to conduct a search of the property.

This provision adequately informs the owner of the commercial premises that the search is being

---

[5] Although this section is directed at *applicants* the Court agrees with Plaintiff it also provides authority to inspect premises of current permit *holders*.  The Court so concludes because it would be impossible for an applicant to "comply" with Chapter 7 or the permit's minimum standards, given those standards only apply to permit *holders*.  Moreover, the next subsection (e), states a permit may only be reinstated following revocation if the holder passes an inspection.  It would hardly be logical to assume only permit *applicants* may be inspected, especially when a dealer seeking reinstatement can hardly be said to be an applicant.  The Court concludes the phrase "above permit applicants" was used to include all types of organizations that must apply for a permit under § 7-33, which covers more than just pet dealers.

made pursuant to law and limits the discretion of the inspecting officers. The section requires either consent to search or a search warrant. McKamey's and its officers' authority to inspect a pet dealer's premises is thus circumscribed to the normal level of protection afforded a personal residence. The Court sees no constitutional issue with this provision.

Moreover, the authority to confiscate animals is codified in §§ 7-19, 7-21, 7-27 discussed above. The confiscation of an animal is explicitly limited to instances where a provision of Chapter 7 of the City Code has been violated. This provision adequately advises the owner of the commercial premises the seizure is made pursuant to law and is properly defined in scope and also sufficiently limits the discretion of inspecting officers. Although the provision provides for confiscation without a warrant or permission, such authority is required to adequately implement the regulatory scheme of animal control. The Court can hardly say an animal control officer who witnesses an individual preparing for a dog fight, for example, must first obtain a warrant to confiscate that animal. This is particularly true where, as here, a pervasively regulated business is at issue. Confiscating animals in mistreatment is an important tool at McKamey's disposal, and is one provided by the City Code.

With respect to Plaintiff's as applied challenge, the Court concludes Plaintiff has sufficiently pleaded a Fourth Amendment violation as to the search of its premises. Plaintiff's complaint states

> 43. The raid of the Pet Shop's store premises was contrary to state law governing administrative inspections, which permits inspections of the Pet Shop's store premises during business hours only.
> 44. Defendants Walsh and Nicholson, and state inspector Burns, gained access to the Pet Shop's premises by asserting their official authority to "inspect" the Pet Shop's premises, although they had no legal authority to do so at 8:10 a.m.

(Court File No. 1, ¶¶ 43, 44). Defendants argue valid consent was provided for the search and the search therefore did not violate the Fourth Amendment. However, the Court must take the complaint as written in a motion for judgment on the pleadings, and the complaint does not state

consent was provided for the search.  *See Siebert*, 256 F.3d at 656 n.4 (holding that absence of evidence the government did not have a warrant is not a basis for rejecting a Fourth Amendment claim because the burden should be on the government to show a warrant in fact existed). Because a search of Plaintiff's premises without a warrant or consent would violate both the statutory authority provided by the City Code, and the Fourth Amendment, Plaintiff has sufficiently pleaded a Fourth Amendment violation in the search of its premises.

Plaintiff also argues the seizure of its animals was unconstitutional.  Under the authority conferred on Defendants in the City Code, which the Court has concluded is constitutionally valid, the impoundment of animals is valid if they are found in violation of Chapter 7.  The Court then, must consider whether Plaintiff has pleaded sufficient facts to show the seizure of its animals was unreasonable under the circumstances.  In considering a Fourth Amendment seizure claim, the Court "must examine the facts and circumstances surrounding the [seizure of property]. Such an inquiry does not require a determination of whether there was in fact a need for the [defendants] to [seize the property]; instead we are required to determine whether the [defendants'] decision to [seize the property] was reasonable under the circumstances." *Lowery v. Faires*, 57 F. Supp. 2d 483, 495 (E.D. Tenn. 1998) (quoting *Collins v. Nagle*, 892 F.2d 489, 493 (6th Cir.1989)).

The Court concludes Plaintiff has pleaded a Fourth Amendment violation in the seizure of its animals.  Whether the seizure itself was reasonable under the circumstances is a fact-intensive inquiry not appropriate for resolution on a motion for judgment on the pleadings.  Plaintiff's complaint contends the animals were healthy and the store was in compliance with state law and the City Code.  Defendant's argument they believed the animals were in danger is in conflict with the factual allegations in the complaint.  *See Siebert*, 256 F.3d at 656 (holding although exigent circumstances would support a seizure of animals no exigent circumstances existed and to the extent

the defendant suggested exigent circumstances existed it was a misrepresentation of the animals' condition). Because the complaint states the animals were in good health and no violations of state law or the City Code had occurred, the Court concludes Plaintiff has pleaded a Fourth Amendment violation in the seizure of its animals.

Plaintiff has also pleaded a Fourth Amendment violation in the seizure of its business records. The City Code is silent on the question of confiscating records. As noted above, however, the City Code grants McKamey broad authority to investigate and enforce the City Code and the Tennessee code. *See* City Code § 7-1(b)(1) ("McKamey Animal Center shall provide animal services for the City of Chattanooga. . . . [including] . . . the enforcement of animal-related codes as stated in the Tennessee code and City Code."); *see also* § 7-1(b)(7) ("[McKamey's duties shall include] [i]nvestigation of cruelty, neglect or abuse of companion animals . . . ."). Provisions of the City Code require creation and preservation of records, as well as providing for inspection of those records. *See* City Code § 7-34(h) ("Whether or not required to have a permit, any person or shelter who sells, barters, adopts out or otherwise gives away a dog or cat shall keep a written record of the description of the animal and the name and address of the purchaser/ adoptee. Such records shall be kept for at least one year and will be provided to the McKamey Animal Center upon request.").

However, as the Court previously discussed, the facts alleged in the complaint pleaded a Fourth Amendment violation in the search of the premises and the seizure of Plaintiff's animals. For the same reasons, the seizure of Plaintiff's business records, as alleged in the complaint, violated the Constitution. Indeed, Defendant's exigent circumstances argument is even less compelling with respect to Plaintiff's business records. Nor could Defendants' confiscation of Plaintiff's business records be supported under the plain view doctrine, because the Court has concluded Plaintiff sufficiently pleaded a Fourth Amendment violation in the search itself. Even if the Court had

concluded Plaintiff failed to plead a Fourth Amendment violation with respect to the search of Plaintiff's premises, the factual allegations in the complaint do not support a finding the records themselves were in plain view. Plaintiff has therefore pleaded a Fourth Amendment violation in the seizure of its business records.

For the foregoing reasons, the Court **DENIES** Defendant's motion with respect to Plaintiff's Fourth Amendment claims in count three of the complaint.

### 3. Liability

Although the Court concludes Plaintiff has sufficiently pleaded facts to show its constitutional rights were violated, its inquiry does not end there. Plaintiff sues Defendants Walsh, Nicholson, and Hurn in both their official and individual capacities. Defendants raise the defense of qualified immunity. The Court will consider Defendants' argument on their individual and

### a. Individual Capacity

Defendants raise the defense of qualified immunity. The defense of qualified immunity shields government officials performing discretionary functions where their "conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This defense "can be raised at various stages of the litigation including at the pleading stage in a motion to dismiss." *English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994).

Plaintiff makes an initial argument the Court must address. Plaintiff argues qualified immunity is inapplicable to Defendant Walsh because she is a private actor. Plaintiff cites *Kauffman v. Penn. Soc. for the Prevention of Cruelty to Animals, et al.*, 766 F.Supp.2d 555, 565 (E.D. Pa. 2011), for the proposition "qualified immunity is not generally available to officers of humane societies when they enforce animal cruelty laws." *Kauffman* analyzed a claim similar to the claim

29

at issue here and concluded qualified immunity was not available to employees of a nonprofit organization that enforces Pennsylvania's animal cruelty laws. The court concluded qualified immunity was inapplicable to the organization's employees because there was no historical evidence such organizations were due immunity. The court specifically concluded a defendant must establish both (1) immunity is supported by the underlying policy reasons justifying qualified immunity, and (2) there is a historical tradition of immunity. Because the court found none of the latter, it found immunity inappropriate.

The court in *Kauffman* based this conclusion on the Supreme Court's explanation of qualified immunity in *Wyatt v. Cole*, 504 U.S. 158 (1992), and *Richardson v. McKnight*, 521 U.S. 399 (1997). *Richarson* held that prison guards of a privately run, for-profit prison were not entitled to qualified immunity. The Court found no historical evidence qualified immunity was to be extended to private prison guards. It also concluded the purposes of the immunity doctrine did not suggest immunity was appropriate. This was in part based on the fact "'marketplace pressures provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance,' and that to this extent, the prison employees were more akin to private workers than public officials." *Bartell v. Lohiser*, 215 F.3d 550, 556-57 (6th Cir. 2000) (quoting *Richardson*, 521 U.S. at 410). The Court made clear, however, it was answering the immunity question "narrowly" and in the "context [of] a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms." *Richardson*, 521 U.S. at 413. The Court specifically noted "[t]he case does not involve a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision."

The Sixth Circuit has distinguished *Richarson* and applied immunity in cases, such as this one, where a nonprofit entity performed a governmental function. For instance, in *Bartell*, the court concluded immunity extended to a private, non-profit entity that provided foster care services to a public entity when the public entity was unable to "meet the needs" of an individual child. 215 F.3d at 557. The Court concluded immunity applied, distinguishing *Richarson*, because the private entity was nonprofit and was closely supervised by the public entity. *Id.* ("Accordingly, because of the closely monitored, non-profit interrelationship between FIA and LSS, we hold that the LSS defendants may assert qualified immunity."). Similarly, in *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 442 F.3d 410 (6th Cir. 2006), *rev'd on other grounds Tennessee Secondary School Athletic Ass'n v. Brentwood Academy*, 551 U.S. 291 (2007), the Sixth Circuit distinguished *Richardson*. The court noted that the limited government supervision of the defendant weighed in favor of finding immunity did not apply. It also noted, however, the defendant was a nonprofit corporation. The court then found one more consideration tipped the balance in favor of a finding of immunity: "[T]here are no [] marketplace pressures [as the kind identified in *Richardson*]; the TSSAA, unlike the prison firm in *Richardson*, does not have to compete with other firms for the job it does on behalf of the state." *Brentwood Academy*, 442 F.3d at 438-39. Moreover, the court noted, it is "unreasonable in the first place" to note a lack of "firmly rooted" history showing a tradition of immunity in the kind of organization at issue, because that kind of organization had "only recently grown in importance and stature, and litigation involving such association has been relatively rare." *Id.*

The Court concludes immunity is available to Defendant Walsh. Although, as in *Brentwood Academy*, supervision of Defendants is minimal, the Court notes McKamey is a nonprofit organization that does not compete with other organizations in administering its function for the city.

There are, as in *Brentwood Academy*, no market pressures that could ensure Defendant Walsh would not exercise its authority in a timid manner. McKamey is similar to the entity in *Bartell* and in *Brentwood Academy*, "serving as an adjunct to government in an essential governmental activity," and doing so without a profit-seeking motive or private market competition.

The court in *Kauffman* explicitly found a defendant must establish a historical tradition of immunity. The Sixth Circuit, however, has concluded it is "unreasonable" to consider whether a historical tradition of immunity exists where a type of organization is relatively new, and litigation involving that type of organization is rare. *See Brentwood Academy*, 442 F.3d at 438-39; *but see McCullum v. Tepe*, 693 F.3d 696, 700 n.7 (6th Cir. 2012) (concluding *Richardson* allows the application of qualified immunity without a history of immunity at common law but noting the Supreme Court's jurisprudence on the issue "may be questionable"). It would be "unreasonable" to require historical evidence of immunity here, because humane societies performing the function of issuing pet dealer permits is, as far as the Court is concerned, a rare and recent development with little litigation.[6] Accordingly, the Court disagrees with the conclusion in *Kauffman*, and concludes qualified immunity is applicable in this case. *See also Fabrikant v. French*, 691 F.3d 193, 212 (2d Cir. 2012) (holding animal control organization defendants were entitled to qualified immunity without discussion of whether immunity was appropriate).

"Once the issue of qualified immunity is properly injected in the case either by a motion to dismiss, an affirmative defense or a motion for summary judgment, the plaintiff is obliged to present facts which if true would constitute a violation of clearly established law." *Dominique v. Telb*, 831

---

[6] In *Kauffman*, the issue was Fourth Amendment violations on the part of the humane society's employees. Section 5511(i) of Title 18 of the Pennsylvania Code authorizes "An agent of any society or association for the prevention of cruelty to animals . . . to initiate criminal proceedings provided for police officers by the Pennsylvania Rules of Criminal Procedure."

F.2d 673, 677 (6th Cir. 1987) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). There are two parts to the qualified immunity analysis: (1) whether, viewing the facts in the light most favorable to the plaintiff, there was a violation of the plaintiff's constitutional right(s), and (2) whether the right was clearly established to a reasonable person, such that its violation would be objectively unreasonable. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). If either of the prongs is answered in the negative, the individual officer is entitled to qualified immunity. *See Saucier*, 533 U.S. at 201.

The Court has already concluded Plaintiff pleaded constitutional violations. The question for the Court is whether the rights were clearly established to a reasonable person. The Court concludes they were, and denies qualified immunity. With respect to the procedural due process violations, the Court concludes Plaintiff's entitlement to the permit was clearly established. *See Martin*, 78 S.W.3d at 263-64. It is also "well established that possessory interests in property invoke procedural due process protections." *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002). Moreover, the general requirement of a pre-deprivation hearing is clearly established. *See Warren*, 411 F.3d at 709. Although Defendants argue they are entitled to rely on a presumptively constitutional city code, the Court has already concluded the provisions of the City Code itself do not contain procedures. Defendants were conferred authority under the City Code, but they were not relying on any presumptively constitutional procedures. To the extent uncertainty exists regarding procedures required to comport with the Constitution, the Court notes facts were alleged in the complaint to suggest any violations identified by Defendants on Plaintiff's premises were either exaggerated or wholly contrived. Such misrepresentation precludes a finding of qualified immunity. *See Siebert*, 256 F.3d at 658-59.

The same must be said for the Fourth Amendment violations alleged. The right to be free

from unreasonable searches and seizures is clearly established. *See Ruby v. Horner*, 39 F. App'x 284, 286 (6th Cir. 2002). The Fourth Amendment's applicability to commercial premises was also clearly established at the time of the conduct at issue. *See Burger*, 482 U.S. at 699. As noted above, the facts as alleged by Plaintiff support a finding Defendants entered the premises without a warrant or consent and unreasonably seized Plaintiff's animals and business records. Defendants then claimed numerous violations of the City Code, which the complaint suggests were nonexistent. This misrepresentation again precludes a finding of qualified immunity. *See Siebert*, 256 F.3d at 658-59. This claim is corroborated by allegations in the complaint McKamey sought a boycott against Plaintiff on its website in an effort to close the store. Administrative searches cannot be used as fishing expeditions for violations. *See Ruttenberg v. Jones*, 283 F. App'x 121, 133 (4th Cir. 2008) ("Our sister circuits have held that an administrative search should be considered a pretext, and thus deemed impermissible, if the inspection was performed solely to gather evidence of criminal activity.") (internal quotations omitted). The facts alleged in the complaint preclude the Court from granting qualified immunity for Defendants.

### b. Official Capacity and Organizational Liability

When a party brings a suit for damages against an officer in his official capacity, it is construed as a suit against entity for which he works. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). Plaintiff's claim against Defendants in their official capacities must therefore be construed as claims against Defendant McKamey, who Plaintiff also listed separately as a defendant.

Section 1983 does not support a theory of *respondeat superior* liability. *Spears v. Ruth*, 589 F.3d 249, 256 n.6 (6th Cir. 2009) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *see also Street v. Corrections Corp. of America*, 102 F.3d 810, 818 (6th Cir. 1996) ("'Monell

involved a municipal corporation, but every circuit to consider the issue has extended the holding to private corporations as well.'") (quoting *Harvey v. Harvey*, 949 F.2d 1127, 1129-30 (11th Cir. 1992)). Rather, liability must be based on "a policy or custom" of McKamey's that "was the moving force behind the deprivation of [ P]laintiff's rights." *Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir. 2012). A § 1983 plaintiff can draw from one of four sources to establish liability for an illegal custom or policy: "(1) . . . official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir.2005)).

Plaintiff pleaded facts supporting a finding of unconstitutional actions taken by Defendant Walsh, who was the official with final decision-making authority in McKamey. Moreover, Defendant Walsh acted pursuant to McKamey's policy with respect to the revocation of Plaintiff's permit. The allegations in the complaint suggest the individual defendants acting in their official capacity were acting pursuant to McKamey policy, and liability may therefore be imputed to McKamey as well.

However, although it is an entity, McKamey can also assert the defense of qualified immunity. *See Bartell*, 215 F.3d at 556-57 (applying qualified immunity to foster care organization); *see also Rosewood Services, Inc. v. Sunflower Diversified Services, Inc.*, 413 F.3d 1163, 1166 (10th Cir. 2005) ("We therefore hold that there is no bar against a private corporation claiming qualified immunity."); *Barbara v. New York Stock Exchange, Inc.*, 99 F.3d 49, 58 (2d Cir. 1996) (holding New York Stock Exchange absolutely immune from suit); *but see Smith v. Levine Leichtman Capital Partners, Inc.*, 723 F.Supp.2d 1205, 1213 (E.D. Cal. 2010) ("[T]he Ninth Circuit has clearly held that qualified immunity is not available to private entities."). For the reasons the Court concluded

qualified immunity was inappropriate for the individual defendants, it also concludes qualified immunity is inappropriate for McKamey.

**B. State Claims**

Plaintiff also asserts violations of the Tennessee Constitution and four other state law claims: abuse of process, conversion, tortious interference with a business relationship, and tortious interference with a contract. The Court will consider each in turn.

**1. Tennessee Constitution**

In counts one through three, which allege violations of Plaintiff's procedural due process rights and right to be free from unreasonable searches and seizures, Plaintiff lists general violations of the Tennessee Constitution in addition to the violations of the United States Constitution discussed above. However, "unlike Section 1983 which provides for a private right of action for violations of the United States Constitution, Tennessee 'has not recognized any such implied cause of action for damages based upon violations of the Tennessee Constitution.'" *Arbuckle v. City of Chattanooga*, 696 F. Supp. 2d 907, 931-32 (E.D. Tenn. 2010) (quoting *Bowden Bldg. Corp. v. Tennessee Real Estate Comm'n*, 15 S.W.3d 434, 446 (Tenn. Ct. App.1999)) (citing *Lee v. Ladd*, 834 S.W.2d 323, 325 (Tenn. Ct. App.1992); *Cline v. Rogers*, 87 F.3d 176, 179–80 (6th Cir.1996)). Accordingly, Defendant's motion is **GRANTED** as to Plaintiff's claims under the Tennessee Constitution.

**2. Abuse of Process**

Plaintiff claims Defendant McKamey committed the tort of abuse of process because it prosecuted the charges against Plaintiff with the ulterior motive of damaging and destroying Plaintiff's business and to extract the payment of money and surrender of property from Plaintiff. "To establish an abuse of process claim, a plaintiff must show '(1) the existence of an ulterior

motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge.'" *In re McKenzie*, 476 B.R. 515, 534-35 (E.D. Tenn. 2012) (quoting *Priest v. Union Agency*, 125 S.W.2d 142, 143 (1939)). In Tennessee, "[m]ere initation" of a suit is not sufficient; "abuse of process lies 'for the improper use of process after it has been issued, not for maliciously causing process to issue.'" *Bell* ex rel. *Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.,* 986 S.W.2d 550, 555 (Tenn.1999) (quoting *Priest*, 125 S.W.2d at 143). This is the key distinction between abuse of process and malicious prosecution: The former occurs after process has been initiated whereas the latter is the actual wrongful initiation of process. *See In re McKenzie*, 476 B.R. at 534-35. The process itself must be perverted to successfully make an abuse of process claim. "The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Bell*, 986 S.W.2d at 555 (internal quotations omitted).

Here, Plaintiff has pleaded an abuse of process claim. As an initial matter, the complaint alleges the charges in City Court were prosecuted by a member of McKamey's Board of Directors, rather than the City Attorney as is normal procedure. As to the first element, Plaintiff alleges McKamey sought "to unlawfully extract the payment of money and surrender of property from" it. According to the complaint, Defendant McKamey sought the boycott of Plaintiff's store the day after it confiscated Plaintiff's property and revoked its permit. After a City Court ordered McKamey to reinspect the premises and return Plaintiff's animals, McKamey created a new portion of its website for concerned citizens to inform the Chattanooga City Council of their thoughts and concerns. These facts suggest an ulterior motive of preventing Plaintiff from conducting its business, rather than merely ensuring enforcement of the City Code.

With respect to the second element, the question is not whether McKamey initiated the City Court proceedings for a bad purpose, but whether it improperly used the process afforded to it after the proceedings were initiated "to obtain a result it was not intended to effect." *Donaldson v. Davidson*, 557 S.W.2d 60, 62 (Tenn. 1977). The complaint alleges no significant violations of the City Code or state law occurred when McKamey instituted proceedings against Plaintiff. Further, in response to the City Court's unfavorable ruling, McKamey ignored the City Court's order and the City claimed it was without authority to order the return of Plaintiff's permit. After the City Court declared a mistrial, the City and McKamey claimed it would prosecute Plaintiff from "ground zero" and McKamey retained possession of a number of Plaintiff's animals pending the new proceeding in contravention of the Court's order. In connection with these actions, the Mayor sought to influence the proceedings in an *ex parte* communication. These allegations, in the light most favorable to Plaintiff, support a finding McKamey improperly used the City Court proceedings as a means of permanently confiscating Plaintiff's animals and seeking the permanent closing of Plaintiff's store. *See McCollum v. Huffstutter*, No. M2002-000510COA-R3-CV, 2002 WL 31247077, at \*7 (Tenn. Ct. App. Oct. 8, 2002) (holding jury could have found abuse of process where evidence suggested an attorney only obtained an arrest warrant against the plaintiff in an attempt to force him to turnover property). The City Court proceedings, on the other hand, are available to determine whether violations of the City Code occurred. Given the above allegations, Plaintiff has pleaded a claim of abuse of process.

The Court therefore **DENIES** Defendants' motion on count four of the complaint.

### 3. Conversion

Plaintiff alleges conversion against Defendants McKamey, Walsh, Nicholson, and Hurn. In Tennessee, "'a party seeking to make out a prima facie case of conversion must prove (1) the

appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights.'" *Thompson v. Thompson*, No. W2008-00489-COA-R3-CV, 2009 WL 637289, at *14 (Tenn. Ct. App. Mar. 12, 2009) (quoting *H & M Enters., Inc. v. Murray*, No. M1999-02073-COA-R3-CV, 2002 WL 598556, at *3 (Tenn. Ct. App. Apr. 17, 2002)). Additionally, "the defendant must intend to convert the plaintiff's property." *Id.* However, "[i]n order to be liable for conversion, a defendant 'need only have an intent to exercise dominion and control over the property that is in fact inconsistent with the plaintiff's rights, and do so; good faith is generally immaterial.'" *May v. Scott*, 388 F. Supp. 2d 828, 838 (W.D. Tenn. 2005) (quoting *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977)).

Here, Plaintiff has alleged sufficient facts to support a conversion claim. Plaintiff alleges Defendants appropriated Plaintiff's property and exercised dominion over it in defiance of Plaintiff's rights. The Court has already concluded Plaintiff alleged facts sufficient to establish a violation of its rights. However, Defendants argue there is insufficient factual allegations in the complaint to suggest Defendants appropriated the property for their own use and benefit. Plaintiff alleges McKamey had a pecuniary interest in taking and keeping Plaintiff's puppies because they would receive increased donations, increased adoption fees, increased "live release rates," inflated claims for "boarding and care" of Plaintiff's animals, and increased grants. Defendant argues this allegation "stands alone" and is insufficient to satisfy the "use and benefit" requirement. However, Defendant offers no explanation for why this allegation would be insufficient. The Court therefore concludes Plaintiff has alleged sufficient facts to establish conversion on the part of McKamey.

However, Plaintiff did not allege facts on which the Court could conclude the individual Defendants Walsh, Nicholson, and Hurn appropriated the property to their individual use and

benefit. *See Ibarra v. Barrett*, No. 3:05-0971, 2007 WL 1191003, at *17 (M.D. Tenn. Apr. 19, 2007) (". . . [T]he plaintiff has failed to lay out the claim's basic elements with respect to both the County and Deputy Barrett. In particular, the plaintiff has not indicated any way in which either defendant appropriated the plaintiff's money to that defendant's own use and benefit."); *Ivey v. Hamlin*, No. M2001-01310-COA-R3-CV, 2002 WL 1254444, at *4 (Tenn. Ct. App. June 7, 2002) (". . . [C]onversion is not implicated in this case and we need not further notice it other than to observe that an element of conversion requires proof Deputy Hamlin appropriated the dog to his own use. There is not proof in the record that Deputy Hamlin appropriated the dog to his own use.") (citation omitted).

Accordingly, the Court **DENIES IN PART** and **GRANTS IN PART** Defendants' motion on count five of the complaint. Specifically, the Court denies the motion as to Defendant McKamey, but grants the motion as to Defendants Walsh, Nicholson, and Hurn.

### 4. Tortious Interference with a Business Relationship

Plaintiff claims Defendants McKamey, Walsh, and Nicholson committed tortious interference with a business relationship. In Tennessee, the tort of intentional interference with a business relationship will lie only if the plaintiff can show "(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means, and finally, (5) damages resulting from the tortious interference." *Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). (citation and emphasis omitted).

The Court concludes Plaintiff has failed to establish this claim. Plaintiff claims Defendants

40

were aware of its relationship with its landlord, Lebcon Associates, LP, and intended "to cause a disruption, breach, or termination of the relationship." However, the only factual allegations in the complaint suggest Defendant Nicholson met with Plaintiff's landlord on multiple occasions and discussed Plaintiff's business without Plaintiff's knowledge. Plaintiff also alleges it believes its landlord had prior notice of the search and seizure. Defendants addressed a petition to Plaintiff's landlord threatening a boycott of the mall until Plaintiff closed. Notably, although Plaintiff argues it "sustained damages" as a result of the alleged interference, no factual allegations support this contention.[7] Indeed, according to the complaint, Plaintiff resumed its business operations at the mall following return of its permit. *See Gold Science Consultants, Inc. v. Cheng*, No. 3:07–CV–152, 2009 WL 1256664, at *11 (E.D. Tenn. May 4, 2009) ("The Restatement provides that there is liability only when interference consists of 'inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.'") (quoting Restatement (Second) of Torts § 766B). Because Plaintiff has failed to allege facts supporting its claim of damages from interference with it business relationship, the Court **GRANTS** Defendants' motion on count six.

### 5. Tortious Interference with a Contract

Finally, Plaintiff alleges Defendants McKamey, Walsh, and Nicholson committed the tort of tortious interference with a contract. Section 47-50-109 of the Tennessee Code, which codifies the common law procurement of breach of contract claim, requires a plaintiff prove the following

---

[7] Plaintiff filed a motion to amend its complaint with a proposed added allegation claiming Plaintiff's landlord facilitated the search of its premises. Accordingly, Plaintiff would claim its lease was breached. However, although the motion was granted, Plaintiff was instructed to file its amended complaint within fourteen days of the order granting its motion. No amended complaint was ever filed.

41

elements: "1) there must be a legal contract; 2) the wrongdoer must have knowledge of the existence of the contract; 3) there must be an intention to induce its breach; 4) the wrongdoer must have acted maliciously; 5) there must be a breach of the contract; 6) the act complained of must be the proximate cause of the breach of the contract; and, 7) there must have been damages resulting from the breach of the contract." *Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152, 158 (Tenn. Ct. App. 1997).

The Court concludes Plaintiff fails to establish a claim for tortious interference with a contract. Although Plaintiff claims Defendants "induced and procured the breach, violation, refusal and/or failure to perform the contract" by its landlord, no allegation in the complaint suggests the lease was in fact breached.[8] Again, the Court notes the complaint states Plaintiff resumed operations after its permit was reinstated. Moreover, were prior notice of the search and seizure sufficient to allege a breach, the Court could not conclude any damages suffered by Plaintiff resulted from the landlord's breach. The damages suffered, which include the months Plaintiff could not operate its business and the loss in value of its property, were caused by the revocation of its permit and confiscation of its animals, not by any breach of contract. The Court will therefore **GRANT** Defendants' motion on count seven.

IV.     **CONCLUSION**

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion or judgment on the pleadings (Court File No. 37). Specifically, the Court denies Defendants' motion with respect Fourth Amendment and abuse of process claims. The Court grants in part and denies in part Defendant's motion as to Plaintiff's procedural due process claim. The

---

[8] The Court again notes Plaintiff's failure to file its amended complaint.

Court grants in part and denies in part Defendants' motion with respect to Plaintiff's conversion claim. The Court also grants Defendants' motion with respect to Plaintiff's Tennessee Constitution claims, tortious interference with a business relationship claim, and tortious interference with a contract claim. Those claims on which the Court has granted Defendant's motion are **DISMISSED WITH PREJUDICE**.

**An order shall enter.**

**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**