UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED PET SUPPLY, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:11-CV-157; 1:11-CV-193 |
| v. | ) | |
| | ) | Collier/Lee |
| CITY OF CHATTANOOGA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM**

Before the Court are cross motions for summary judgment filed by Defendants City of Chattanooga ("City") (Court File No. 62, 79), Animal Care Trust, also called McKamey Animal Care and Adoption Center ("McKamey") (Court File No. 70), Karen Walsh ("Walsh") (Court File No. 72), Marvin Nicholson, Jr. ("Nicholson") (Court File No. 65, 75), and Paula Hurn ("Hurn") (Court File No. 67) (collectively, "Defendants"), and Plaintiff United Pet Supply, Inc. ("Plaintiff") (Court File Nos. 69, 82).[1] For the following reasons, the Court will **DENY IN PART** and will **GRANT IN PART** Defendants' motions for summary judgment (Court File No. 62, 65, 67, 70, 72, 75, 79) and will **DENY IN PART** and will **GRANT IN PART** Plaintiff's partial motion for summary judgment (Court File Nos. 69, 82).

I.     **FACTS**

Plaintiff operated a pet store in Hamilton Place Mall in Chattanooga, Tennessee (Court File No. 1, ¶ 7). Plaintiff was licensed to operate a pet store by the state. Defendant McKamey is a Tennessee corporation with which the City contracts for animal control services. As a result of changes to the Chattanooga City Code ("City Code") in 2010, the City delegated enforcement of

---

[1] Court File numbers refer to the docket of 1:11-CV-157.

provisions of the City Code pertaining to animals to McKamey, including the issuance of permits for businesses engaged in dealing in the sale of pets or animals. Defendants Walsh, Hurn, and Nicholson are all employees of McKamey, serving as Executive Director, Director of Operations, and Animal Service Officer, respectively.

In March and April 2010, pursuant to McKamey's authority under the City Code, Defendants Walsh and Nicholson began appearing at the pet store operated by Plaintiff. Over a two month period, Defendants arrived during business hours several times. On a number of these visits, Defendants spoke to Plaintiff's landlord to discuss issues with Plaintiff's business. On May 11, McKamey issued a permit to Plaintiff, signed by Defendant Walsh, stating Plaintiff was approved as a pet dealer in Chattanooga. McKamey had received a number of complaints regarding Plaintiff's store, and had visited the store on multiple occasions between January 20, 2010 and April 28, 2010. During these visits, McKamey representatives discussed the provisions of the City Code with employees and suggested changes, such as instituting an exercise plan for Plaintiff's puppies. However, on June 15, 2010, Defendants Walsh, Nicholson, and State Inspector Joe Carroll Burns arrived at Plaintiff's pet shop around 8:10 a.m., before business hours, and confiscated animals, business records, certain other property, and Plaintiff's city permit. This event was precipitated by statements made to Defendant Walsh by Ashley Knight, a former employee of the pet shop, one week earlier. The employee informed her a dog had died at Plaintiff's store without veterinary care and had been placed in a freezer. Knight also stated Brandy Hallman, the store's manager, placed an injured but live hamster in an outside garbage compacter. Defendant Hurn would arrive around 10:00 a.m. At 10:35, Sergeant Roger Gibbens of the Chattanooga Police Department responded to a call to assist Defendants and "stand by" while the animals were confiscated. Gibbens states he did

2

not participate in the actual removal, but was merely there in support.

When Defendants and others arrived on June 15, they discussed the complaint with Hallman and requested review of the dog's records. Hallman let Defendants in the store. Hallman later informed Plaintiffs' district manager, Patti Vacca, about Defendants' presence. When they arrived they saw soiled kennels, unreplenished water receptacles, and other signs of neglect. Of particular concern to Defendants was the temperature of the store. Hallman informed them the air conditioning had not been functioning properly for a number of weeks. Burns then asked to inspect an isolation room, and Hallman led Defendants to the area where the animals slept. Walsh and Nicholson described further unsanitary conditions including sick puppies and dogs with dried feces and urine on their bodies.

However, every morning Plaintiff's employees undertook a three-hour cleaning procedure, which normally began at 7:00 a.m. and ended at 10:00 a.m. Due to the hour Defendants arrived at the pet shop, Plaintiff claims much of the cleaning had not yet occurred. After Defendant Hurn arrived she began videotaping the conditions of the premises. While Defendants were preparing citations, Walsh spoke with Plaintiff's Vice President, Christopher Brooks, who informed her he was going to seek a temporary restraining order against McKamey.

Defendants confiscated Plaintiff's animals, including thirty-two puppies, six rabbits, one ferret, one guinea pig, and forty-two hamsters or mice. Defendants then confiscated business records and Plaintiff's physical copy of its city permit. Defendant Walsh informed Plaintiffs they could not sell pets until their hearing on June 24, 2010. While this process was ongoing, Plaintiff sought temporary injunctive relief in Hamilton County Circuit Court. Plaintiff's motion was denied by the Circuit Court.

McKamey issued forty-three citations alleging ninety violations of the City Code. The facts supporting the violations were alleged as follows.

1. Air conditioning not working 3 weeks or more
2. No report to operations manager of mall
3. Isolation room at 85+ at 7 AM east
4. Hamsters and gerbils given dirty water in open bowls capable of drowning them
5. Cages cleaned with "Fabuloso", Mr. Clean or Lysol
6. Water bottles leaking until empty
7. Empty water bottles in isolation
8. Hamster was attacked "several days ago" no vet treatment provided
9. No water in any hamster cages in ISO ["isolation room"]
10. Cages broken undisinfectable
11. Cage bottoms/grates broken can trap feet
12. Dog died 4 days after health check, no record as to vet check.
13. Food for human consumption stored with vax
14. Cleaning containers not labeled
15. Training manager no knowledge of procedures.

(Court File No. 1, ¶ 65). State Inspector Burns issued a written warning to Plaintiffs to repair one of the compressors in its air conditioning system. The citation also listed dirty or empty water bowls, isolation for sick puppies at over 80 degrees, open food container, hamsters and gerbils water container was dirty, and the cages were cleaned with bleach rather than disinfectant. Charles Hatcher, State Veterinarian, also issued a notice of intent to suspend Plaintiff's state license based on the inspection. The state, however, never revoked Plaintiff's state permit. The day following the raid, McKamey's website linked to an online petition to close the pet shop in Chattanooga. The petition called for a boycott of the Hamilton Place Mall until Plaintiff's pet shop was closed.

When McKamey took possession of the pet shop's puppies, they were all considered "bright, alert, and responsive" by McKamey, except for one German Shepherd puppy that was being treated by the pet shop's veterinarian. McKamey did not seek immediate care for the German Shepherd puppy. McKamey began seeking homes for the puppies. In September, the German Shepherd

4

puppy died.

On June 24, 2010, nine days after Plaintiff's property was confiscated, the Chattanooga City Court held a hearing regarding the charges against Plaintiff. McKamey sought permanent custody of the animals confiscated during the raid. On June 30, the City Court ruled some of the conditions listed by Defendant Walsh could be remedied, McKamey would inspect the pet shop before allowing Plaintiffs to return the animals to the premises, and Plaintiffs were to receive all animals not diagnosed with disease or illness. The City Court listed requirements in the Code of Federal Regulations requiring minimum standards in treatment of animals, and the corollative state procedures. The City Court noted the store was in poor condition and detailed a number of the issues that caused it concern. It concluded, however, the violations could be remedied. The City Court then continued the case for two weeks to allow the issues to be remedied and reinspected before animals were brought back. The City Court also ordered healthy animals returned to Plaintiff to be taken to a different store where no violations exist, but they were not to be taken back to the store until the violations were addressed. The City Court reserved the issue of both the administrative costs due to McKamey for looking after the animals and the costs imposed due to the violations.

McKamey, however, did not return the animals. The Mayor of Chattanooga also sent a letter to the City Court, explaining he did not want McKamey to go uncompensated for its expenses, McKamey should be able to maintain custody of the animals until they are repaid, and he did not trust Plaintiff:

> I really need to talk with you about this situation. We must not leave the McKamey Center holding the bag for all these expenses associated with the Pet Company's unacceptable conditions. I want McKamey to hold the animals until the bills are paid and I want the company to confirm with their own veterinarians that any

5

animals that they reclaim are accepted as healthy. I do not trust this company.

(Court File No. 82-1, p. 28). McKamey then inspected the store again and failed it for new violations of the City Code.

After a brief continuance, the City Court declined to withdraw Plaintiff's permit, and deferred to the state with respect to its state license. Plaintiff's state license was subsequently renewed. The City sought repayment from Plaintiffs for some of its expenses incurred while caring for Plaintiff's confiscated animals. The City Court maintained McKamey must return the permit without a reapplication process, because McKamey did not have the authority to revoke the permit without a hearing, and that it would issue a ruling on the City's expenses (Court File No. 69-9). The Mayor later disseminated an open letter to the City Court critical of its ruling:

> In response to inquiries by a number of concerned citizens, I must say that I am totally frustrated by the slow, soft and reluctant pace of justice in the case of The Pet Company.
>
> Transcribed testimony from the original hearing has clearly established that the conditions existing at the Pet Company were hot, dirty and generally disgusting on June 15, 2010 - the date that animals were seized and removed from the premises. The Court has received evidence that the air conditioning in the store had been malfunctioning for three weeks, cages were in poor condition with cracks in the grates or trays that would allow urine or feces to flow down onto animals below and sick animals were not properly isolated or cared for. Specifically, the court records that "A German Shepherd was in isolation with no water" and that several of the animals tested positive for giardia – a serious and contagious parasitic infection.
>
> There are other charges involving violations such as outdated and mishandled medications, poorly trained staff, nonexistent training manuals and a general absence of management and care. The evidence supporting the 90 violations is compelling and recorded in graphic detail, yet there seems to be an air of acceptance and willingness to be intimidated by the company's lawyers. I understand that the court must be careful not to discourage private enterprise or drive a company out of business. Employees who are attempting to protect helpless animals who have clearly been mistreated by a business in this city cannot be so timid. Where public health and the welfare of citizens and animals is involved, I must maintain that we should do the right thing in spite of corporate bullying tactics.

6

Setting aside all the legal rhetoric and arguments about the exact wording of the definition of what constitutes "cruelty" and "neglect", one fact is glaringly obvious: The Pet Company was marketing sick and dying animals at their poorly maintained store in Hamilton Place with inadequate concern that they were spreading disease and disappointment among the citizens of Chattanooga.

The McKamey Center is the City's animal enforcement division. And is therefore, fully responsible for ensuring that the city codes for animal safety and welfare are adhered to by citizens, as well as corporations.

If not for intervention by staff of The McKamey Center, the practice doubtlessly would have continued. Does anyone believe that the actions removing animals from the documented conditions by McKamey and the State of Tennessee (blessed by a local court) were excessive? Why then does it appear that McKamey is on the defensive and the company that permitted the conditions that led to the corrective action is being granted what can only be characterized as amazing grace and remarkable legal latitude?

With all of this said, I must also note that the company is trying to avoid the cost of mishandling their responsibilities. Trying to paint themselves as the victim, the company is attempting to leave McKamey and the citizens of Chattanooga holding the bag for the $40,000 bill for housing and veterinary care for these mistreated animals.

Any person who has ever loved an animal or had a child experience the death of a family pet or anyone who simply pays taxes and expects government to act when action is called for should not accept such calloused behavior from a private enterprise as "business as usual". Our responsibility is to protect our citizens and where the health and welfare of our citizens is in conflict with the profit motives of a New Jersey corporation, I stand with our families.

(Court File No. 82-1, 29-30). The City Court then declared a mistrial due to the Mayor's actions.

After a different judge was assigned to the case in City Court, briefing was sought on the issue of whether the revocation of Plaintiff's permit was unlawful. The City Court later dismissed the case on double jeopardy grounds and stated the City Court was without authority to make an order regarding Plaintiff's permit (Court File No. 69-12). After multiple demands for its license and animals, the City returned the permit to Plaintiff and Plaintiff reopened its shop. A concurrent proceeding was filed in Hamilton County Circuit Court by Plaintiff seeking a return of the animals

7

still in McKamey's possession.  On September 29, 2010, the Circuit Court ordered Plaintiff's animals returned.  McKamey subsequently returned the animals still in its possession.  Plaintiff's dogs were no longer puppies and were adopted by families without charge.

Plaintiff sought redress in this court and in Hamilton County Circuit Court.  Once the latter case was removed, the cases were consolidated.  After the instant motion was filed, the City amended the relevant portion of the City Code, essentially removing the permit provisions delegating the task to McKamey altogether and establishing an "Animal Control Board" to determine whether the City should require permits and, if so, what type of permits to require. Chattanooga City Ordinance 12653 (Oct. 2, 2012).  References to the City Code refer to the Code as it existed when the alleged violations occurred.

## II.     STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);  *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).  The Court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

To survive a motion for summary judgment, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).  Indeed, a "[plaintiff] is not entitled to a trial on the basis of mere allegations."  *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *2-3 (E.D. Tenn. Nov. 4, 2009) (explaining the Court must determine whether

8

"the record contains sufficient facts and admissible evidence from which a rational jury could reasonably find in favor of [the] plaintiff"). In addition, should the non-moving party fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should grant summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. ANALYSIS

Plaintiff states a 42 U.S.C. § 1983 claim against Defendants for violations of its procedural due process rights and Fourth Amendment rights. Plaintiff also makes state law claims against McKamey. The Court will address Plaintiff's claims in turn.[2]

### A. Section 1983

To state a viable claim under 42 U.S.C. § 1983, a plaintiff must allege he was deprived of a right, privilege, or immunity secured by the Constitution or laws of the United States by a person acting under color of law, without due process of law. *Flagg Brothers Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Chatman v. Slagle*, 107 F.3d 380, 384 (6th Cir. 1997); *Brock v. McWherter*, 94 F.3d 242, 244 (6th Cir. 1996); *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir. 1994); *Rhodes*

---

[2] Plaintiff also lists Title VII of the Civil Rights Act of 1964 as a foundation for jurisdiction. However, Title VII is irrelevant to this case.

*v. McDannel*, 945 F.2d 117, 119 (6th Cir. 1991), *cert. denied*, 502 U.S. 1032 (1992). Although the Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts underlying the claim, the plaintiff must provide sufficient allegations to give defendants fair notice of the claims against them. *Leatherman v. Tarrant County Narcotic Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993). To state a § 1983 claim, Plaintiff must allege sufficient facts that, if true, would establish the defendants deprived him of a right secured by the Constitution of the United States while acting under color of law. *See Brock*, 94 F.3d at 244. The parties agree Defendants acted under color of state law. Plaintiff claims violations of its procedural due process and Fourth Amendment rights.

### 1. Procedural Due Process

In its order granting in part and denying in part co-defendants' motion for judgment on the pleadings, the Court found Plaintiff successfully pleaded a procedural due process claim with respect to its permit and the confiscation of its animals. Because no relevant factual dispute exists as to the revocation of Plaintiff's permit with respect to the facts discussed in the Court's prior order, the Court relies on those conclusions in this order, and concludes Plaintiff suffered a procedural due process violation when its permit was revoked without a pre-deprivation hearing. Summary judgment is therefore appropriate for Plaintiff on this claim.

With respect to Plaintiff's procedural due process claim in the confiscation of its animals the Court concludes significant factual disputes exist to render disposition on summary judgment inappropriate. As the Court noted in its prior order, were exigent circumstances regarding the health of the animals present, a pre-deprivation hearing may not be necessary to comport with procedural due process requirements. *See Siebert v. Severino*, 256 F.3d 648, 660 n.10 (7th Cir. 2001) (holding seizure of animals without a pre-deprivation hearing may be appropriate where exigent

circumstances exist).

Here, the parties dispute the condition of the animals upon McKamey's arrival, as well as the condition of the premises. Plaintiff and Defendants disagree whether a violation of any applicable law ever occurred. Plaintiff stresses Defendants never recorded the temperature above 85 degrees for a four hour period, citing 9 C.F.R. § 3.2(a) which prohibits the temperature from exceeding 85 degrees for four consecutive hours.[3] However, Defendants stress Hurn recorded the temperature at or above 85 degrees for longer than that time, and did so outside the isolation room wherein many animals were housed. Testimony suggests the room was significantly hotter than the area outside the isolation room. Moreover, Plaintiff claims the "unrebutted testimony" of Burns shows auxiliary ventilation was provided because he testified there was a fan that was turned on (Court File No. 90-2). However, Hurn testified she did not see or feel any fan or auxiliary ventilation in the isolation room (Court File No. 67-1, p. 3) (Court File No. 67-2, pp. 205-06, 236). This is corroborated by Walsh's affidavit (Court File No. 72-1, p. 6). Whether animals were kept in temperatures that violated the temperature requirements is in factual dispute.

More broadly, Plaintiff claims generally all the allegations of uncleanliness and unsanitary conditions were simply the result of timing; that is, because its employees had not been afforded the opportunity to finish their daily morning tasks, the store appeared far more unclean than it otherwise would. However, Defendants describe a terrible stench as well as urine and feces dripping from upper to lower cages, and fecal matter matted into the fur of puppies (Court File No. 72-5, p. 103); (Court File 72-6, pp. 2-3). When Defendants arrived, they discovered a dead hamster, which had

---

[3] Tennessee has incorporated 9 C.F.R. Part 3 by reference in its regulations regarding cat and dog dealers. TENN. COMP. R. & REG. 0080-2-15-.03. McKamey is empowered to enforce the City Code and Tennessee law. *See* City Code § 7-1(b)(1) ("McKamey Animal Center shall provide animal services for the City of Chattanooga. . . . [including] . . . the enforcement of animal-related codes as stated in the Tennessee code and City Code.").

apparently been dead for some time (Court File No. 67-1, p. 4). Additionally, whereas Plaintiff points to Hallman's testimony before the City Court to suggest water was provided to animals continuously (Court File No. 92-3, p. 3), Defendants provide testimony to suggest a number of the animals were without water all together. Whether these conditions are consistent with normal cleaning procedure is a question of fact not appropriate for disposition on summary judgment. The Court is not in a position to grant summary judgment for either party on this claim.

### 2. Fourth Amendment

In its order granting in part and denying in part co-defendants' motion for judgment on the pleadings, the Court concluded the City Code was facially valid with respect to its provisions on administrative searches of pet dealers as well as seizure of animals. The Court relies on those conclusions in this order as well. However, the Court also concluded Plaintiff stated claims for applied constitutional violations in the actual search and seizure of its premises. The Court will consider those challenges again.

### a. Search

With respect to the constitutionality of the search, Defendants argue Hallman provided consent to search the premises. Pursuant to the statutory framework in the City Code, inspections of the premises of a pet dealer may be effected pursuant to consent of the occupant. City Code § 7-12 (empowering animal services officers to search a premises "but only if the consent of the occupant or owner of the property is freely given or a search warrant is obtained"). However, Plaintiff argues the statutory program is insufficient under the test outlined in *United States v. Burger*, 482 U.S. 691 (1987). As noted above, the Court has already concluded the statutory inspection program in this case passes constitutional muster. Plaintiff also argues consent is simply irrelevant to a warrantless administrative search, and cites *AL Post 763 v. Ohio Liquor Control*

*Comm.*, 694 N.E.2d 905, 911 (Ohio 1998) for the proposition a "permit holder's consent . . . is unnecessary when an agent conducts a warrantless administrative search pursuant to a constitutionally acceptable statutory inspection program." However, the key distinction between this case and *AL Post* is the statutory inspection program in this case explicitly requires consent or a warrant, whereas in *AL Post* the program did not require either.

Under the Fourth Amendment, valid consent to search may be given by an employee to search his employer's premises. *See United States v. Ayoub*, 498 F.3d 532, 538-39 (6th Cir. 2007). Although the inquiry whether an employee has authority to consent is fact-specific, "[i]f the employee's job duties include the granting of access to the premises, authority to consent is more likely to be found." *United States v. Jones*, 335 F.3d 527, 531 (2003). Moreover, even if an employee lacks actual authority, the search will still pass constitutional scrutiny if he had apparent authority. Possession of keys to the establishment and authority to open the business to the public have been found sufficient to confer apparent authority to consent to a search even where officers were aware the employee was not the business owner. *See United States v. King*, 627 F.3d 641, 648 (7th Cir. 2010).

The government bears the burden of establishing consent was "freely and voluntarily given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Courts are to consider "the characteristics of the individual giving consent, such as 'age, intelligence, and education'; whether the questioner engaged in 'coercive or punishing conduct'; and the presence of 'more subtle forms of coercion that might flaw an individual's judgment.'" *Clemente v. Vaslo*, 679 F.3d 482, 489 (6th Cir. 2012). Hallman, the store manager who provided consent in this case, testified she "believed" Defendants asked to inspect the store, then stated "yes, sir [they did]," and after she opened the gate and let them in the store they informed her they were there to inspect a complaint (Court File No. 70-17, pp. 4-5).

13

She stated she opened the gate because she recognized Nicholson and on past occasions had allowed him to inspect the store without objection. There is no evidence of coercion or threats. Indeed, Hallman appeared to "act[] voluntarily in a manner least likely to endanger [her] job." *Clemente*, 679 F.3d at 489. Plaintiff has offered no contradictory evidence to suggest the consent was anything less than voluntary. Indeed, Plaintiff apparently concedes consent was given, but argues consent is insufficient to render the search of its premises constitutional under the pervasively regulated business doctrine.

The Court disagrees, and concludes summary judgment is appropriate for Defendants on this issue.

### b. Seizure

The Court, however, concludes substantial issues of fact remain regarding the seizure of Plaintiff's animals and business records. Defendants argue the seizure was reasonable under a number of doctrines. First, Defendants argue the seizure was appropriate under the totality of the circumstances. In considering a Fourth Amendment seizure claim, the Court "must examine the facts and circumstances surrounding the [seizure of property]. Such an inquiry does not require a determination of whether there was in fact a need for the [defendants] to [seize the property]; instead we are required to determine whether the [defendants'] decision to [seize the property] was reasonable under the circumstances." *Lowery v. Faires*, 57 F. Supp. 2d 483, 495 (E.D. Tenn. 1998) (quoting *Collins v. Nagle*, 892 F.2d 489, 493 (6th Cir.1989)).

Second, Defendants argue seizure of the animals and business records was valid under the plain view doctrine. Four factors must be established to invoke the plain view doctrine: "(1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be plainly seen; (3) the object's incriminating nature must be immediately apparent; and

14

(4) the officer must have a right of access to the object." *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007). To determine if an object's incriminating nature is immediately apparent, the Court considers three additional factors: "(1) 'a nexus between the seized object and the items particularized in the search warrant'; (2) 'whether the 'intrinsic nature' or appearance of the seized object gives probable cause to believe that it is associated with criminal activity'; and (3) whether 'the executing officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature.'" *Id.* at 510 (quoting *United State v. McLevain*, 310 F.3d 434 (6th Cir. 2002)). However, "[i]n addition to the[] three factors [that must be proved to establish an objects incriminating nature is immediately apparent], we have specifically held that an object's incriminating nature is not immediately apparent if it 'appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity[.]'" *Id.*

Third, Defendants argue seizure of the animals was appropriate under the exigent circumstances exception to the warrant requirement. Courts find exigent circumstances "when the officers were in hot pursuit of a fleeing suspect; (2) when the suspect represented an immediate threat to the arresting officers and public; (3) when immediate police action was necessary to prevent the destruction of vital evidence or thwart the escape of known criminals." *Causey v. City of Bay City*, 442 F.3d 524, 529 (6th Cir. 2006) (quoting *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir.1992)). Defendants cite *New York v. Rogers*, 708 N.Y.S.2d 795 (N.Y. App. Term 2000), which extends the exigent circumstances exception to protection of animals in danger.

However, the Court is unable to determine this question on summary judgment. As discussed above, significant factual disputes exist regarding the severity of the condition present in the store at the time of the inspection. All of Defendants' theories rely on the Court's crediting their

version of the events; namely, the Court must assume the animals were in significant danger and accordingly seizure was justified under one of the above exceptions to the warrant requirement. Given the factual disputes detailed above, the Court is not in a position to make that determination on summary judgment. Moreover, with respect to Plaintiff's business records, Defendants have offered no evidence the records were in plain view. In fact, employees of the pet store assisted Hurn in "cataloging" the animals and providing her with the animals' health records and impound information (Court File No. 70-1, pp. 3-4). The circumstances of this activity are unknown to the Court, and are certainly insufficient for the Court to grant summary judgment on the basis of the plain view doctrine.

The Court therefore **GRANTS IN PART** and **DENIES IN PART** summary judgment for Defendants and **DENIES** Plaintiff's motion for summary judgment on its Fourth Amendment claim. Specifically, the Court grants summary judgment for Defendants on Plaintiff's claim the search was unconstitutional, but denies the summary judgment on Plaintiff's claim the seizure of its animals and business records was unconstitutional.

### 3. Liability

#### a. Qualified Immunity

The Court previously denied qualified immunity for Defendants in its previous order disposing of their motion for judgment on the pleadings (Court File No. 144). The Court must again deny qualified immunity to Defendants. For the reasons stated in its previous order, the Court concludes the rights allegedly violated were clearly established to a reasonable individual.

Defendants Nicholson and Hurn raise an additional argument the Court must address. Defendants Nicholson and Hurn argue they were acting under orders from their superior, Walsh, and "'[p]lausible instructions from a superior or fellow officer support qualified immunity where, viewed

objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (e.g. a warrant, probable cause, exigent circumstances).'" *Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003) (quoting *Bilida v. McCleod*, 211 F.3d 166, 174-75 (1st Cir. 2000)). However, again the Court notes the dispute regarding the condition of the premises. Based on that dispute, the Court cannot conclude "in light of the surrounding circumstances" it would be reasonable for either Defendant to rely on Walsh's instruction to confiscate the animals.

Accordingly, the Court **DENIES** summary judgment for Defendants on this ground.

### b. City's Liability and Defendants' Official Capacity

A municipality cannot be liable under a *respondeat superior* theory for § 1983 violations. *Spears v. Ruth*, 589 F.3d 249, 256 n.6 (6th Cir. 2009) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Rather, municipalities are liable when they "have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Cash*, 388 F.3d at 542 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). A § 1983 plaintiff can draw from one of four sources to establish a municipality's liability for an illegal custom or policy: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Spears*, 589 F.3d at 256 (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). A plaintiff bears the burden of showing "that the unconstitutional policy or custom existed, that the policy or custom was connected to the [municipality], and that the policy or custom caused [the] constitutional violation." *Napier v. Madison Cnty.*, 238 F.3d 739, 743 (6th Cir. 2001).

The Court concludes a question of fact remains regarding liability of the City. Plaintiff

argues, as it did in response to co-defendants' motion for judgment on the pleadings, that § 7-34(d) of the City Code is an official city "policy" that confers direct municipal liability. However, as the Court noted in its order granting co-defendants' motion for judgment on the pleadings, the City Code does not specify the procedures required to revoke a city permit. Indeed, Plaintiff emphasizes the lack of parameters in the City Code (*see* Court File No. 1, ¶¶ 25) ("The revised City Code stated that the City Permit 'may be revoked if negligence in care or misconduct 'occurs' that is detrimental to animal welfare or to the public,' without specifying any procedures for revoking the permit or any provision for a hearing."). Further, the following passage from *Zinermon v. Burch*, 494 U.S. 113, 135-16 (1990), clarifies procedural due process cases challenges such as Plaintiff's are not facial challenges.

> It may be permissible constitutionally for a State to have a statutory scheme like Florida's, which gives state officials broad power and little guidance in admitting mental patients. . . . Burch's suit is neither an action challenging the facial adequacy of a State's statutory procedures, nor an action based only on state officials' random and unauthorized violation of state laws. Burch is not simply attempting to blame the State for misconduct by its employees. He seeks to hold state officials accountable for their abuse of their broadly delegated, uncircumscribed power to effect the deprivation at issue.

The Court concludes the provision of the City Code at issue does not create a municipal policy of not providing a pre-deprivation hearing.

Plaintiff argues the City is liable because Defendant Walsh's actions constituted a final decision from a policy-making official. A "municipality is liable for an official's unconstitutional action only when the official is the one who has the 'final authority to establish municipal policy with respect to the action ordered.'" *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1985)). Authority to exercise discretion does not make a municipal official a "final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Id.*

(quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). Courts look to state law, including relevant municipal codes, to determine whether an official has authority to make final municipal policy. *Id.* Thus the Court must look to the City Code.

This case presents a difficult question: Can an official be "authorized" to commit an act violating procedural due process, such that the case is removed from the rule of *Parratt v. Taylor*, 451 U.S. 527 (1981), but not vested with final policymaking authority that would confer liability on a municipality? In other words, can a municipality, consistent with the constitution, authorize enforcement to an official in such broad terms[4] as to provide that official discretion to commit a due process violation, but still be insulated from liability because the official was not explicitly given authority to determine policy? The Court must conclude that it can. Indeed, § 1983 cases often result in both a city and its officers authorized to enforce the law being insulate from liability. In *Pembaur*, the Supreme Court clarified, while in some instances a policymaking authority can impute liability to the municipality, in most cases municipalities must not be held liable for the actions of its officers, even if they are authorized to exercise discretion in performance of their duties.

Such is the case here with respect to McKamey and Defendant Walsh. The City Code

_____

[4] The Court notes Plaintiff has not challenged the Code as unconstitutionally vague or overbroad. *See City of Chicago v. Morales*, 527 U.S. 41 (1999) (concluding a vague no loitering statute is not unconstitutional on First Amendment grounds, but violates due process due to its vagueness and failure to limit discretion of enforcement officials). Indeed neither of those words appears in the complaint, nor in Plaintiff's many filings. Rather, Plaintiff lists language alleging the lack of limits on McKamey's discretion as an allegation under the count alleging a violation of procedural due process. *See, e.g.*, *Simon v. Cook*, 261 F. App'x 873 (6th Cir. 2008) (treating void-for-vagueness, overbreadth, and procedural due process as separate claims). Given none of the parties addresses a vagueness challenge in their filings, the Court concludes Defendants were not on notice of a vagueness challenge contained in the ambiguous complaint, to the extent Plaintiff would have asserted one. *See Cummings v. City of Akron*, 418 F.3d 676, 681 (6th Cir. 2005) ("We apply a 'course of the proceedings' test to determine whether defendants in a § 1983 action have received notice of the plaintiff's claims where the complaint is ambiguous."). The Court will therefore take the complaint as written.

explicitly authorizes McKamey to "enforce" the law, not to make it. *See* City Code § 7-1 ("McKamey Animal Center shall provide animal services for the City of Chattanooga. . . . [including] . . . the enforcement of animal-related codes as stated in the Tennessee code and City Code."). Moreover, the Mayor is given exclusive executive authority by the City Charter: "The mayor shall be authorized to administer oaths and shall supervise and control all of the divisions of the city, except as otherwise provided, and shall see that the ordinances of the City and the provisions of the Charter are observed." Chattanooga City Charter § 8.28. Additionally, the Mayor is required to oversee enforcement of the City's laws:

> It shall be the duty of the mayor to be vigilant and active in causing the ordinances of the city and the laws of the state to be executed and enforced within the city . . . [and] to exercise a general supervision over all the executive and ministerial officers of the city, and see that their official duties are honestly and faithfully performed.

City Charter § 8.38. Then the Mayor is given authority to supervise McKamey in the performance of its duties. Indeed, if Walsh were not an "executive [or] ministerial officer" then she could hardly be a final policymaking official for the City. Nor would she be included within *Pembaur*'s language imputing liability onto a city for its officials' actions. Because she did not have final and "unreviewable" authority to set policy for the City, the Court concludes Plaintiff cannot hold the City liable for her actions.

However, the Court concludes the Mayor's actions in regard to the instant case provide an inference of city policy that imputes liability to the City. In his open letter, the Mayor expressly approved of McKamey's decision to confiscate Plaintiff's property, (Court File No. 82-1, pp. 29-30) ("Transcribed testimony from the original hearing has clearly established that the conditions existing at the Pet Company were hot, dirty and generally disgusting on June 15, 2010 - the date that animals were seized and removed from the premises."), and to revoke its permit, (*id.*) ("Setting aside all the legal rhetoric and arguments about the exact wording of the definition of what constitutes "cruelty"

and "neglect", one fact is glaringly obvious: The Pet Company was marketing sick and dying animals at their poorly maintained store in Hamilton Place with inadequate concern that they were spreading disease and disappointment among the citizens of Chattanooga."). The Mayor's reference to McKamey's responsibility also appears to be an express approval of its official actions (*id.*) ("The McKamey Center is the City's animal enforcement division. And is therefore, fully responsible for ensuring that the city codes for animal safety and welfare are adhered to by citizens, as well as corporations."). This evidence combined with McKamey's repeated statements regarding its policy of revocation without a pre-deprivation hearing as well as the presence of McKamey's officials, state officials, and an officer of the Chattanooga Police Department at Plaintiff's place of business on the day in question presents a logical inference McKamey's actions were initiated and approved by the Mayor. This evidence creates an issue of fact with regard to the City's liability not appropriate for disposition on summary judgment.

Accordingly, the Court **DENIES** the City's motion for summary judgment. The Court also **DENIES** Plaintiff's motion for summary judgment on the same issue.

### B.      Punitive Damages

In its complaint, Plaintiff seeks punitive damages against Defendants McKamey, Walsh, Nicholson, and Hurn. Punitive damages are available pursuant to a § 1983 against individual defendants "if it is shown that the defendant engaged in behavior that was 'motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Defoe* ex rel. *Defoe v. Spiva*, 556 F. Supp. 2d 748, 754 (E.D. Tenn. 2008) (quoting *Kolstad v. Am. Dental Ass'n*, 461 U.S. 30, 56 (1983)). The Sixth Circuit interprets this standard to mean punitive damages are warranted if a defendant's conduct is "'grossly negligent, intentional or malicious.'" *Id.* at 754-55 (quoting *Hill v. Marshall*, 962 F.2d 1209, 1217 (6th Cir.1992)).

With respect to Plaintiff's state law claims, Tennessee requires "a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly" before punitive damages may be awarded. *Arbuckle v. City of Chattanooga*, 696 F. Supp. 2d 907 (E.D. Tenn. 2010) (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992)).

> A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation. A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

*Hodges*, 833 S.W.2d at 901. A plaintiff must prove the intentional, fraudulent, malicious, or reckless character by clear and convincing evidence. *Id.*

Plaintiff does not significantly respond to Defendants' argument against punitive damages, other than to allege it should be awarded punitive damages for Defendant Walsh's abuse of process. However, the abuse of process claim was only lodged against McKamey. Plaintiff alleges Defendants McKamey and Walsh sought to destroy its business through the procedural avenues available to it as well as through publicity generated by its actions. Moreover, Plaintiff alleges Defendant retained possession of its animals after being ordered to return them. Such conduct could be considered intentional and justify an award of punitive damages and the Court **DENIES** Defendants McKamey's and Walsh's motions. However, Plaintiff has not alleged conduct on the part of Defendants Hurn and Nicholson individually, that would rise to that level. Accordingly, the Court **GRANTS** Defendants Hurn's and Nicholson's motion for summary judgment on this issue.

Plaintiff did not seek punitive damages in its complaint against the City. It is well

established a plaintiff may not seek punitive damages against a municipality under § 1983. *Brock v. Warren County, Tenn.*, 713 F. Supp. 238 (E.D. Tenn. 1989) (citing *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981)). However, in response to the City's motion, Plaintiff alleged it could seek punitive damages through the abuse of process tort. However, Plaintiff never alleged abuse of process against the City. Moreover, the City is correct it is protected by the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-205(2), which immunizes the City from, *inter alia*, abuse of process. *See Ramsey v. Chattanooga Housing Authority*, No. 1:09–CV–233, 2011 WL 2601016, at *8 (E.D. Tenn. June 30, 2011). Accordingly, the City's motion regarding punitive damages is **GRANTED**.

### C. State Claims

Two state claims survived the Court's prior order disposing of Defendants' motion for judgment on the pleadings: abuse of process and conversion.

#### 1. Abuse of Process[5]

McKamey moves for summary judgment on Plaintiff's abuse of process claim. "To establish an abuse of process claim, a plaintiff must show '(1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge.'" *In re McKenzie*, 476 B.R. 515, 534-35 (E.D. Tenn. 2012) (quoting *Priest v. Union Agency*, 125 S.W.2d 142, 143 (1939)). In Tennessee, "[m]ere initation" of a suit is not sufficient; "abuse of process lies 'for the improper use of process after it has been issued, not for maliciously causing process to issue.'" *Bell* ex rel. *Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986

---

[5] McKamey notes the Sixth Circuit has never determined whether an abuse of process claim is cognizable under § 1983. *See Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 676-77 (6th Cir. 2005). Because "the elements necessary to prove it would likely mirror those of state law," *id.*, the Court considers this claim under the state claim section for the purposes of this motion.

S.W.2d 550, 555 (Tenn.1999) (quoting *Priest*, 125 S.W.2d at 143). This is the key distinction between abuse of process and malicious prosecution: The former occurs after process has been initiated whereas the latter is the actual wrongful initiation of process. *See In re McKenzie*, 476 B.R. at 534-35. The process itself must be perverted to successfully make an abuse of process claim. "The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Bell*, 986 S.W.2d at 555 (internal quotations omitted).

McKamey argues it enforced the City Code, as was its duty, and did not pervert the process in City Court. Moreover, McKamey claims it did not seek reimbursement for all possible expenses, and accordingly could not have been seeking some collateral goal. However, Plaintiff points to the petition on McKamey's website, to McKamey's actions during the City Court proceedings including its refusal to return the permit when ordered and its refusal to return Plaintiff's animals. The Court concludes a question of fact remains as to whether McKamey improperly used the process of the City Court proceeding to achieve its ulterior motive of seeking permanent closure of Plaintiff's store due to ideological antipathy and to permanently obtain Plaintiff's animals. The Court **DENIES** McKamey's motion.

### 2. Conversion

With respect to McKamey's conversion claim, it repeats the arguments the Court rejected in its order disposing of Defendants' motion for judgment on the pleadings. Accordingly, for the reasons the Court discussed in its previous order, the Court **DENIES** McKamey's motion on this claim.

## IV. CONCLUSION

For the foregoing reasons, the Court will **DENY IN PART** and will **GRANT IN PART** Defendants' motions for summary judgment (Court File No. 62, 65, 67, 70, 72, 75, 79) and will **DENY IN PART** and will **GRANT IN PART** Plaintiff's partial motion for summary judgment (Court File Nos. 69, 82). Specifically, the Court grants summary judgment for Plaintiff on its procedural due process claim regarding its permit. The Court grants summary judgment for Defendants on Plaintiff's claim the search of its premises violated the Fourth Amendment. The Court grants Defendants Hurn's and Nicholson's motions with respect to punitive damages. The Court also grants the City's motion with respect to punitive damages. The Court denies all parties' motions with respect to Plaintiff's procedural due process claim regarding its animals and business records, Fourth Amendment claim regarding seizure of its animals and business records, and as to the City's liability. The Court denies Defendants' motions as to qualified immunity. The Court denies Defendants McKamey's and Walsh's motion with respect to punitive damages, and denies McKamey's motion as to the torts of abuse of process and conversion.

**An order shall enter.**

**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**